

ENTERED
02/17/2011

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **MARCO A. CANTU,** *et al,* | § | **Case No. 08-70260** |
| Debtor(s). | § | |
| | § | **Chapter 7** |
| | § | |
| **MICHAEL B SCHMIDT, TRUSTEE,** *et al,* | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **Adversary No. 09-7018** |
| | § | |
| **MARCO A. CANTU,** *et al,* | § | |
| Defendant(s). | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

Trustee Michael Schmidt ("Trustee"); Guerra & Moore, Ltd., LLP ("Guerra & Moore"); and Howard S. Grossman, P.A. (collectively, "Plaintiffs") instituted this adversary proceeding seeking to have both Marco Cantu ("Mark Cantu") and Roxanne Cantu denied a discharge under 11 U.S.C. § 727(a). The Plaintiffs asserted that the Cantus engaged in improper transfers of estate assets, made false oaths in connection with their bankruptcy cases, refused to comply with lawful court orders, failed to keep adequate records, and withheld information from the Trustee. Considering Mark and Roxanne Cantu separately, the Court denies discharge to each.

## BACKGROUND

Mark and Roxanne Cantu filed a voluntary chapter 11 petition on May 6, 2008, No. 08-70260. Mar-Rox, Inc. ("Mar-Rox"), whose case is jointly administered, filed a voluntary chapter 11 petition on the same day. The Cantus owned Mar-Rox. The Cantus' case was converted to a case under chapter 7, and Michael Schmidt was appointed Trustee on June 24, 2009.[1] Mar-Rox's case was converted to chapter 7 on July 1, 2009.[2] The Cantus' bankruptcy

---

[1] No. 08-70260, Doc. No. 1034.

has spawned sixteen related adversary proceedings, including this one. In this adversary proceeding, the Plaintiffs object to the Cantus' discharge.

Mark Cantu is a practicing attorney with his law office in McAllen, Texas. He and his wife attended the University of Texas at Austin. Both graduated with bachelor's degrees, and Mr. Cantu went on to earn a law degree. He has practiced law for over twenty years.

The Cantus have owned numerous businesses in and around McAllen and Edinburg, Texas. In addition to Mr. Cantu's law office, the Cantus owned and operated the University Inn, the Palm Plaza Motel and RV Park, the La Vista Mobile Home Park ("La Vista"), and the Dominion Apartments.[3] They owned Mar-Rox, and they had an interest in Cor-Can, Inc. and Canflor, L.P.[4] Individually and through Mar-Rox, the Cantus owned several commercial properties, including the Atrium, four restaurants, the Pan-American Plaza, the University Center, the Trigo Office Building, the Delta Building, and the St. Anthony's Building. Including the Mar-Rox properties, the Cantus owned approximately $24.4 million in real estate.

Mark and Roxanne Cantu enjoyed an affluent lifestyle. Their home was worth approximately $575,000.00 at the time of bankruptcy.[5] The Cantus scheduled over $3.9 million in personal property.[6] They owned at least four vehicles, including a 2008 Mercedes-Benz 6.3

---

[2] No. 08-70260, Doc. No. 1057.

[3] The Dominion Apartments' real property was owned by Mar-Rox. No. 08-70261, Doc. No. 161, at 4. Testimony indicated that the business was owned by Canflor, L.P.

[4] No. 08-70260, Doc. No. 609, at 6.

[5] No. 08-70260, Doc. No. 609, at 1.

[6] No. 08-70260, Doc. No. 609, at 10.

valued at $150,000.00.[7]  Although their schedules included only $10,000.00 in fur and jewelry, the Cantus sold at least $134,575.00 in jewelry in the two years before bankruptcy.

The Cantus took on millions of dollars in debt to finance their businesses and their lifestyle.  Facing foreclosure on some of their properties by the International Bank of Commerce ("IBC"),[8] the Cantus and Mar-Rox filed for bankruptcy.  At the time of filing, the Cantus had over $37.4 million in secured debt[9] and over $10.7 million in unsecured debt.[10]  Mar-Rox's secured debt exceeded $20.9 million.[11]

The Cantu and Mar-Rox bankruptcy cases have been fraught with omissions, misstatements, and controversies.  The Cantus' schedules and Statement of Financial Affairs failed to include significant assets and transactions, including the $134,575.00 in jewelry sales. The Cantus did not schedule the law office's interest in two contingency fee cases or Mar-Rox's interest in several water damage cases.  The Cantus also failed to schedule two life-sized bronze horses, worth $20,000.00, and later secreted the horses to Mr. Cantu's sister's property. Additionally, in the course of the bankruptcies, Mr. Cantu transferred $50,000.00 to his close friend Baldemar Perez.

The Cantus' use of estate cash was suspicious and frequently undocumented.  During the bankruptcies, the Cantus' Monthly Operating Reports ("MORs") reflected that they had spent $285,773.61 from the two bankruptcy estates—around $253,000.00 from their individual estate

---

[7] No. 08-70260, Doc. No. 609, at 9.  The Cantus listed five vehicles on Schedule B, but they noted that one of the cars, a 2006 Altima, belonged to Roxanne Cantu's father.  No. 08-70260, Doc. No. 609, at 9.

[8] No. 08-70260, Doc. No. 794, at 11.

[9] No. 08-70260, Doc. No. 609, at 23.

[10] No. 08-70260, Doc. No. 245, at 18.

[11] No. 08-70260, Doc. No. 72, at 25.

alone.[12]  The evidence at trial indicated that the Cantus had removed thousands of dollars in cash from the estates in addition to the amounts reflected on the MORs.  Both Roxanne and Mark Cantu took petty cash from the University Inn and La Vista.  Mark Cantu also admitted to extensive transfers from the Dominion Apartments, but these transfers were not clearly noted on the MORs.

Throughout the bankruptcies, the Cantus were uncooperative with the Court and the Trustee.  They failed to provide material documents to the Trustee, including records of their extensive jewelry sales, information about their contingency fee interests, and records of their use of estate funds.  The Cantus, particularly Mr. Cantu, also directly violated Court orders.  On two occasions, Mr. Cantu interfered with the sale of estate assets that had been authorized by the Court.  Mr. Cantu also failed to comply with an order to turn over non-exempt property.  Both Cantus violated the Court's cash collateral orders.

Sixteen adversary proceedings arose out of the Cantus' bankruptcy case.  A few are relevant to the allegations in this discharge proceeding.  The first adversary, No. 08-7028, was filed in June 2008.  In that action, Mark Cantu and Guerra & Moore, Plaintiffs in this adversary, disputed whether Mark Cantu, through his law office, had tortiously interfered with Guerra & Moore's contract with their clients.  Guerra & Moore obtained a jury verdict in state court, but Mark Cantu removed the case to the Bankruptcy Court before a judgment was entered.  The Court remanded the proceeding on June 25, 2008.[13]  Guerra & Moore later obtained a judgment against Mr. Cantu, and in August 2008, they filed a dischargeability complaint against

---

[12] Trial Tr. 51-52 (day 1).

[13] No. 08-7028, Doc. No. 20.

Mr. Cantu.[14]   In the second adversary between the parties, Guerra & Moore asserted that the judgment was nondischargeable under § 523(a)(6) of the Bankruptcy Code, which states that debts for willful and malicious injury are nondischargeable.   Guerra & Moore asserted that Mr. Cantu was collaterally estopped from relitigating the issue of willful and malicious intent. On December 15, 2008, the Court granted judgment for Mark Cantu.[15]

In November 2008, the Cantus sued IBC, alleging that IBC had wrongfully foreclosed on some of the Cantus' properties.[16]   That dispute settled in February 2009, and the adversary was dismissed in April 2009.

Mark Cantu also sued Tomas Corona, his former business associate through Cor-Can, in August 2009.   Mr. Cantu asserted causes of action against Corona for breach of fiduciary duty and unjust enrichment in connection with Corona's actions as President of Cor-Can.   The Trustee removed the case to the Bankruptcy Court, and the Court dismissed the lawsuit as frivolous on October 19, 2009.   The Court's dismissal order, which was entered on October 21, 2009, prohibited further frivolous conduct from Cantu.[17]

The Plaintiffs filed this adversary proceeding on December 9, 2009.   The Second Amended Complaint was filed on February 26, 2010.   Trial was held on August 23-24, 2010 in McAllen, Texas.   Mark Cantu, Juan Carlos Pena, Ted Sunderland, and George Stone testified on August 23, 2010.   Michael Schmidt and Roxanne Cantu testified on August 24, 2010.   The Court reserved judgment and ordered post-trial briefing.

---

[14] No. 08-07035, Doc. No. 1.

[15] No. 08-7035, Doc. No. 25.

[16] No. 08-07046, Doc. No. 1.

[17] No. 09-07011, Doc. No. 15.

The Plaintiffs moved to admit rebuttal testimony on September 9, 2010. Doc. No. 53. The Court granted the motion on October 5, 2010. The Plaintiffs filed post-trial briefs on September 14, 2010 and September 15, 2010. Doc. Nos. 54 & 55. Roxanne Cantu and Mark Cantu each filed briefs on October 27, 2010. Doc. Nos. 66 & 67. Howard S. Grossman, P.A., filed reply briefs for the Plaintiffs on November 23, 2010. Doc. Nos. 75 & 76.

ANALYSIS

The Court considers Mark Cantu and Roxanne Cantu separately. When one spouse engages in improper conduct, and the other does not, courts grant a discharge to the innocent spouse. *See First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 993 (5th Cir. 1983) (denying discharge to debtor-husband who fraudulently transferred estate property, but granting discharge to debtor-wife who benefited from fraudulent activities, and may have known about them, but did not participate in them); *Jordan v. Bren (In re Bren)*, 122 F. App'x 285, 289 (8th Cir. 2005) (granting discharge to debtor-wife, despite husband's fraudulent activities, where she exercised no role in the financial affairs of the business aside from signing checks, and evidence showed she had no fraudulent intent). For each cause of action, the Court therefore considers whether the Plaintiffs proved that both Mark Cantu and Roxanne Cantu engaged in conduct warranting denial of discharge.

Because many of the allegations against both the Cantus concerned their conduct in the Mar-Rox bankruptcy case, the Court first considers whether any of the Mar-Rox conduct may provide a basis for denial of discharge. Discharge may be denied based on conduct in another bankruptcy only under § 727(a)(7), and the Plaintiffs did not plead a § 727(a)(7) cause of action. The Court therefore considers whether a cause of action under § 727(a)(7) was tried by consent.

## Trial by Consent of § 727(a)(7) Cause of Action

Although the Plaintiffs' complaint against the Cantus does not specifically plead a § 727(a)(7) claim, a § 727(a)(7) claim was tried by consent against both Mark Cantu and Roxanne Cantu.  Any actions taken by either of them in the Mar-Rox bankruptcy case may therefore provide a basis for denial of discharge.

Under § 727(a)(7), a debtor may be denied a discharge for conduct in another bankruptcy case if:

> (a)(7) the debtor  has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider[.]

Mark and Roxanne Cantu are the sole shareholders and officers of Mar-Rox.  They are insiders.  The term *insider*, with respect to a corporate debtor, includes directors, officers, persons in control of the debtor, and relatives of a general partner, director, officer, or person in control of the debtor.  11 U.S.C. § 101(31)(B).  The Cantus therefore may be denied a discharge in their individual case because of conduct in the Mar-Rox bankruptcy case.

Although the Plaintiffs did not plead a cause of action under § 727(a)(7), the cause of action was tried by consent.  "While a party must place an opposing party on notice of a claim, an issue not pled may also be tried by consent."  *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 480 (5th Cir. 2009) (citing Fed. R. Bankr. P. 7015 & Fed. R. Civ. P. 15(b)) (citations omitted).  "The test for such consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment."  *Beaubeouf v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir. 1992) (quoting *In re Prescott*, 805 F.2d 719, 725 (7th Cir. 1986)).

The Cantus had sufficient notice of the Plaintiffs' § 727(a)(7) claim, and they had a fair opportunity to defend against the claim. The joint pre-trial statement did not list a § 727(a)(7) cause of action, but the list of contested issues of fact included several issues that related to the Cantus' conduct in the Mar-Rox case:

> c.  whether the Debtors improperly transferred cash collateral to themselves and/or for their living expenses. . . .
>
> k.  whether the Debtors failed to keep and preserve adequate records of cash collateral taken from University Inn and La Vista Mobile Home Park.
>
> l.  whether the Debtors failed to keep and preserve adequate records of 5 water damage cases in which Debtors were plaintiffs. . . .
>
> p.  whether the Debtors withheld from an officer of the estate (the Trustee) much of the valuable and significant information described hereinabove, including:  [ . . . ]
> > iv. documentation of money taken from La Vista Mobile Home Park and University Inn motel; [ . . . ]
>
> q.  whether the Debtors' withholding of information was knowing and fraudulent.
>
> r.  whether the Debtors in connection with the case made a false oath or account by failing to schedule: [ . . . ]
> > ii. Mar-Rox's state-court water damage lawsuits and his law offices' other personal injury suits under Schedule B; [ . . . ]
>
> z.  whether the Debtors failed to disclose water damage cases in which they were plaintiffs. . . .
>
> bb. whether the Debtors refused to obey orders of the Bankruptcy Court relating to cash collateral of the University Inn. . . .
>
> ee. whether the Bankruptcy Court orders were lawful, and not orders to testify.
>
> ff. whether Debtors' failure to obey Bankruptcy Court orders was intentional or the result of mistake or inability to comply.[18]

---

[18] Doc. No. 29, at 3-4.

At trial, the Plaintiffs presented evidence, without objection, regarding these factual issues.  In particular, the Plaintiffs presented extensive evidence regarding (i) the use of cash collateral at the University Inn, a Mar-Rox property, (ii) misstatements on the Mar-Rox MORs regarding cash collateral; (iii) failure to keep and preserve adequate records at the University Inn; (iv) withholding of University Inn records; (v) the existence and omission from the schedules of several Mar-Rox water damage cases; (vi) failure to keep and preserve records of the Mar-Rox water damage cases; and (v) withholding of records of the Mar-Rox water damage cases.

Evidence of the Cantus' conduct in the Mar-Rox case would be irrelevant to any cause of action other than § 727(a)(7).  The Cantus did not object to the relevance of the evidence. Moreover, because the factual issues relating to the Mar-Rox case were clearly presented in the joint pretrial report, the Cantus had sufficient notice of the § 727(a)(7) cause of action and sufficient opportunity to present evidence.  The Cantus were not prejudiced by the trial of the § 727(a)(7) cause of action, and the Court concludes that a § 727(a)(7) action was tried by consent with respect to both debtors.

### Mark Cantu's Discharge

Throughout the Cantu and Mar-Rox bankruptcies, Mark Cantu has displayed a pattern of omission, obfuscation, and noncompliance.  He cannot disregard the requirements of the Bankruptcy Code and then obtain the protection of a discharge.  Mark Cantu is denied discharge under:  (i) § 727(a)(4)(A) for false oaths; (ii) § 727(a)(2)(B) for improper concealment and transfer of estate assets; (iii) § 727(a)(6)(A) for refusal to comply with lawful court orders; (iv) § 727(a)(3) for failure to keep adequate records; (v) § 727(a)(4)(D) for withholding information from the Trustee; and (vi) § 727(a)(7) for making false oaths, refusing to comply

with lawful court orders, failing to keep adequate records, and withholding information from the Trustee in the Mar-Rox case.[19]  Each basis for denial of discharge is independent.

### A.  False Oaths

The Plaintiffs proved that Mark Cantu made several material false oaths in the course of the bankruptcy cases.  Mr. Cantu made false oaths regarding:  (i) the existence of the Mar-Rox water damage cases; (ii) the contingency fee interests; (iii) the pre-conversion jewelry sales; (iv) the property held for others; and (v) the transfer of $50,000.00 to Baldemar Perez.  The Court denies Mark Cantu's discharge on the basis of each false oath, taken independently.

To establish a false oath under § 727(a)(4)(A), the plaintiff must show that (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.  *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005).  "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors."  *Beaubouef*, 966 F.2d at 178 (quoting 4 COLLIER ON BANKRUPTCY ¶ 727.04[1], at 727-59).  "The subject matter of a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  *Id.*

Material, intentional misstatements on the schedules or Statement of Financial Affairs are false oaths.  A debtor in chapter 7 bankruptcy has a continuing, affirmative duty to provide

---

[19] Mark Cantu is an attorney licensed by the State Bar of Texas and admitted to practice in the United States District Court for the Southern District of Texas.  Because his conduct may also implicate the wisdom of continuing his license in force, a copy of this Memorandum Opinion will be provided to the State Bar with a recommendation that a thorough investigation of Cantu's conduct be undertaken.  It will also will be provided to the Chief Judge of the United States District Court for the Southern District of Texas with a recommendation that Mr. Cantu be removed from the rolls of admitted attorneys in this District.

complete, accurate schedules and a Statement of Financial Affairs.  *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 599 (Bankr. N.D. Tex. 2006).  "A debtor has a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects."  *Id.* (quoting *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991).  The schedules and Statement of Financial Affairs are not required to be perfect.  *Davis v. Tomasek (In re Tomasek)*, 175 F. App'x 662, 670 (5th Cir. 2006).  The Court can consider reasonable explanations offered by the debtor with respect to errors in the schedules and Statement.  *U.S. Trustee v. Dung Thi Pham (In re Dung Thi Pham)*, 2006 WL 2927448, at *2 (Bankr. S.D. Tex. Oct. 10, 2006).

However, debtors who intentionally or with reckless indifference make false statements when filling out their schedules are not entitled to a discharge.  *Wells*, 426 B.R. at 599 (citing *The Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767 (Bankr. N.D. Tex. 2005).  When the schedules and Statement are replete with omissions and inconsistencies, the schedules and Statement themselves evidence a "pattern of disregard for the truth that supports fraudulent intent." *Dung Thi Pham*, 2006 WL 2927448, at *2 (quoting *Dupre v. Scott (In re Dupre)*, 145 F. App'x 855, 856 (5th Cir. 2005)).

### (i)      Mar-Rox Water Damage Cases

Mark Cantu failed to disclose several pending water damage lawsuits in which Mar-Rox was a plaintiff.  The cases were filed around 2006, and Mr. Cantu hired the law firm Gravely & Pearson to prosecute the cases.[20]  None were disclosed on either the Mar-Rox schedules or on the Statement of Financial Affairs.[21]  Mr. Cantu did not disclose the cases when he amended the

---

[20] Trial Tr. 140-41 (day 1).

[21] Trial Tr. 141 (day 1).

Mar-Rox schedules in September 2008.[22]  Finally, Mr. Cantu did not disclose the cases to the Trustee when the case was converted to chapter 7.  The Trustee did not learn of the existence of the cases until Gravely and Pearson contacted the Trustee.[23]

Mr. Cantu testified at trial that he "settled the majority of those cases in 2007," and that he "thought they were over, which is why I didn't list the cases."[24]  In the context of Mr. Cantu's pattern of omissions,[25] this explanation is not plausible.  Mark Cantu is a practicing attorney, and he had an affirmative duty to ensure the accuracy of the schedules and Statement.  Given that the cases netted $30,000.00 in settlements after the bankruptcy filing,[26] the Court does not find it plausible that Mark Cantu was unaware that the cases had not settled pre-petition.

However, even if Mr. Cantu was legitimately uncertain about whether all the water damage cases were settled, he had a duty to inquire.  His failure to report the water damage cases stems either from fraudulent intent or reckless disregard for the truth.  Mark Cantu was capable of reporting the cases accurately, and he chose not to do so.  The omission of the cases was material.

---

[22] Trial Tr. 142 (day 1).

[23] Trial Tr. 141 (day 1).

[24] Trial Tr. 189-90 (day 1).

[25] In addition to the conduct directly related to the Plantiffs' causes of action, the evidence at trial revealed numerous other omissions and misstatements.  For example, Mark Cantu testified under oath at his 2004 examination that he did not own any partnership interests of any sort.  In fact, Mr. Cantu owned a partnership interest in the Hill Country Apartments, together with Lourdes Ramirez.  Mr. Cantu testified at trial, "I forgot about the Hill Country Apartments." Trial Tr. 24 (day 2).  Mr. Cantu "forgot" about many assets and transactions during the course of the bankruptcy.  A pattern of such "forgetfulness" is evidence of fraudulent intent or, at the very least, reckless disregard for the truth.  *See Guenther*, 333 B.R. at 767-68 (finding that a pattern of non-responsiveness, delay in amending schedules and statements, and withholding information was sufficient to show fraudulent intent and/or reckless disregard for the truth for the purposes of a § 727(a)(4)(A) action).

[26] Trial Tr. 51 (day 2); *see* Trial Tr. 189-90 (day 1).

Mr. Cantu defends the omission by alleging that he instructed Mar-Rox's counsel to contact the Trustee. The Court does not give significant weight to Mr. Cantu's assertion that "Mark Gravely called me and I gave him [the Trustee]'s number. That's what I think happened."[27] First, Mr. Cantu never personally provided information to the Trustee, which he was obligated to do. His failure to provide the information to the Trustee weakens the credibility of his assertion that he told Gravely to call the Trustee. Second, even if Mr. Cantu told Gravely to call the Trustee, this action came only after Mr. Cantu filed schedules omitting the Mar-Rox cases and, through months of bankruptcy, failed to amend those schedules. Finally, Mr. Cantu provided no evidence, besides his own testimony, that he had asked Gravely to call the Trustee. The Court finds the unsubstantiated oral testimony to lack credibility. The Court therefore finds that Mr. Cantu fraudulently omitted the water damage cases from his schedules and Statement.

### (ii)    Interest in Contingency Fees

Mark Cantu also failed to schedule his interest in contingency fees in at least two lawsuits. Mr. Cantu, through his law office, had a contingent interest in cases called *Financial Management, Inc. v. Summit Sports Club* ("Summit Sports Club case") and *Abigail Moreno v. Rich Chava Pizza Restaurant* ("Abigail Moreno case").[28] Neither of these cases was listed as a contingent receivable on the Cantus' original schedules.[29]

When the case was converted, Mr. Cantu gave the Trustee a stack of contingency fee contracts.[30] The stack of contracts did not include any information on the Abigail Moreno or

---

[27] Trial Tr. 210 (day 1).

[28] *See* Trial Tr. 53, 56 (day 2); Trial Tr. 146-47, 180 (day 1).

[29] Trial Tr. 146-47, 180-81 (day 1).

[30] Trial Tr. 52 (day 2).

Summit Sports Club cases.[31]  The Trustee became aware of the Summit Sports Club case when Mr. Gravely, Mark Cantu's lawyer for the Mar-Rox water damage cases, mentioned the existence of another case involving a referral fee.[32]  The Trustee later received $18,500.00 as a referral fee when the Summit Sports Club case settled.  The Abigail Moreno case was handled by former associates of Mark Cantu, who started their own firm called Romero, Gonzalez & Benavides.[33]  Mr. Benavides informed the Trustee that the estate was entitled to a referral fee after the settlement of the Abigail Moreno case.  The Trustee received $6,600.00.[34]

Mr. Cantu said at trial that "Juan Gonzalez, an ex-associate at my office, handled the Abigail Moreno case, and I didn't know that he had taken it with him and I retained an interest in it. . . . But it was later cleared out.  He got zero on the case."[35]  Mr. Cantu did not explain why the Summit Sports Club case was not scheduled, but also asserted that he "never received a penny of it."[36]

The Plaintiffs proved that Mr. Cantu either willfully or with reckless disregard for the truth failed to schedule the cases.  Mr. Cantu's explanations for why he failed to schedule the contingent interests are unconvincing and riddled with inaccuracies.  Although he stated that the Abigail Moreno case was "cleared out," and that Mr. Benavides got no money, the Trustee later received a referral fee.  And while Mr. Cantu continued to assert at trial that he "never received a

---

[31] Trial Tr. 52 (day 2).

[32] Trial Tr. 53 (day 2).

[33] Trial Tr. 56 (day 2).

[34] Trial Tr. 56 (day 2).

[35] Trial Tr. 147 (day 1).

[36] Trial Tr. 190 (day 1).

penny" on the Summit Sports Club case, that case resulted in an even larger referral fee.  Mr. Cantu's excuses are based on mischaracterizations of the outcomes of the cases.

Again, the Court gives little weight to Mr. Cantu's assertion that the Trustee found out about the Summit Sports Club case after Mr. Cantu told Gravely to call the Trustee.  Mr. Cantu was obligated to report the cases earlier, and even if Mr. Cantu's testimony was correct, he did too little to correct the omission of the two cases.  As a lawyer, Mark Cantu was aware when he filed for bankruptcy that he had an obligation to report his assets accurately, including any contingent interests in cases.  Throughout his bankruptcies, Mr. Cantu was represented by competent counsel.  Nevertheless, Mr. Cantu failed to file accurate reports, and he provided no reasonable explanation of his failure.  Furthermore, the omissions took place in the context of a pattern of omissions and misstatements.  The omissions involved the existence of assets of the estate, and they were material.  The Court concludes that Mark Cantu, with fraudulent intent, omitted the Abigail Moreno case and the Summit Sports Club case from his schedules.

### (iii)   Jewelry Sales

Mark Cantu also failed to disclose  the pre-petition transfer of $134,575.00 in jewelry in the two years preceding bankruptcy.  Mr. Cantu did not personally prepare the Statement of Financial Affairs (referred to in his testimony below as his "SOFA"), on which the disclosure should have occurred, for either the Cantu bankruptcy case or the Mar-Rox case.  However, he provided the information to his accountant:

> **[Mr. Lumber]**       And you did not participate in the preparation of the SOFA's?
>
> **[Mark Cantu]**       Yes; but you asked me if I prepared them. My accountant did.
>
> **[Mr. Lumber]**       Did you provide all the information to be included in the SOFA's?

| | |
|---|---|
| **[Mark Cantu]** | Yes. |
| **[Mr. Lumber]** | Did you read them before you signed them? |
| **[Mark Cantu]** | Yes.[37] |

Question 10 on the Statement asked for a listing of all transfers other than in the ordinary course of business. The Cantus are not jewelry dealers, and therefore any sales were outside the ordinary course of business.[38] On the Statement, the Cantus checked the box indicating that there were no transfers out of the ordinary course of business.[39]

However, the Plaintiffs presented evidence that the Cantus made extensive sales of jewelry in the two years preceding bankruptcy.[40] The Cantus made five jewelry sales to Shannon Fine Jewelers.[41] From February 2007 until at least as late as March 25, 2008—less than a month and a half before the Cantus filed for bankruptcy—the Cantus consigned and sold $26,250.00 of jewelry with Shannon Fine Jewelers. None of these sales were listed on the Statement.[42]

---

[37] Trial Tr. 126 (day 1).

[38] Trial Tr. 132 (day 1).

[39] Pls' Ex. 3, at 7.

[40] The Cantus also sold artwork shortly after the petition was filed. The artwork may have been consigned to the gallery prior to filing. On May 13, 2008, the Nuevo Santander Gallery in McAllen, Texas paid Mr. Cantu $10,290.00 for artwork that the gallery had held on consignment for the Cantus. Pls' Ex. 38. Under the Cantus' agreement with the gallery, the Cantus were paid 70% of the retail price of the artwork within thirty days of the gallery's receipt of payment from their client. Pls' Ex. 38. The Cantus did not have an order from the Court authorizing them to sell the artwork through the Nuevo Santander Gallery. Mr. Cantu testified that he did not know, five days into the bankruptcy, that he needed an order to sell the artwork. The sale through the Nuevo Santander Gallery may have been an improper transfer under § 727(a)(2)(B), but because it was not required to be listed on the Statement of Financial Affiars, it was not a false oath. The Cantus' Schedule B listed $90,000.00 in "Books, pictures, art" and it is unclear whether this amount included the artwork that had been consigned to the Nuevo Santander Gallery. No. 08-70260, Doc. No. 136, at 4; Doc. No. 609, at 5. The Plaintiffs did not plead that the Nuevo Santander Gallery sale was an improper transfer or that the Cantus improperly concealed the artwork, and the Court does not decide this issue.

[41] Pls' Ex. 77; Trial Tr. 12-15 (day 2).

[42] Pls' Ex. 3, at 7; Trial Tr. 15 (day 2).

The Cantus also sold $48,000.00 in jewelry to Regency Jewelers on May 11, 2006, less than two years before the Cantus' bankruptcy filing.[43]  On October 6, 2007, they sold diamonds for $23,325.00.[44]  Finally, on October 17, 2007, the Cantus sold another diamond for $36,000.00 to Regency Jewelers.[45]  Mark Cantu's name and driver's license were included on the Regency Jewelers records.[46]  None of the sales to Regency Jewelers were disclosed.[47]  The total of the sales proceeds from the jewelry transactions was $134,575.00.

Given the size of the jewelry sales and their proximity in time to the bankruptcy filing, it is not plausible that the failure to disclose the sales was inadvertent.  In light of Mr. Cantu's repeated failures to disclose and his affirmative duty to ensure that the information on his bankruptcy filings was correct, the Court finds that he omitted the jewelry sales with fraudulent intent.  The jewelry sales were a significant series of business transactions for the Cantus, and their omission was material.  Mark Cantu is denied a discharge for his false oaths in failing to disclose the jewelry transfers.

### (iv)     Property the Cantus Held for Others

The Cantus failed to list property they held for other people on their Statement of Financial Affairs.  Question 14 on the Statement asks the debtor to list any property held for another person.  Mark Cantu listed an office building.[48]  He did not list any other property held

---

[43] Pls' Ex. 78; Trial Tr. 16-17 (day 2).

[44] Pls' Ex. 78, Trial Tr. 17 (day 2).

[45] Pls' Ex. 78, Trial Tr. 17-18 (day 2).

[46] Pls' Ex. 78.

[47] Pls' Ex. 3, at 7.  Trial Tr. 18 (day 2).

[48] Trial Tr. 126 (day 1).

for another person.[49]   However, after the Court entered an order authorizing the sale of almost all of the Cantus' office equipment and office furniture, Mark Cantu claimed that several pieces of furniture were owned by others.[50]

Mr. Cantu's employee Juan Rocha signed an affidavit claiming that a desk and a chair belonged to him.[51]   Mr. Cantu's father-in-law signed an affidavit claiming ownership of a desk and a chair.[52]   Finally, Mr. Cantu's sister signed an affidavit claiming to own some large oriental rugs in the law office.[53]   The Cantus' Statement of Financial Affairs never listed these items, and it was never amended to include the items.

The omitted furniture is related to the assets and business dealings of the Cantus' estate, and the Cantus had an affirmative duty to ensure the accuracy of the Statement.   Mark Cantu was responsible for providing the information on the Statement.   In light of Mr. Cantu's education and ability to provide accurate information about the furniture in his own law office, along with his pattern of omissions and concealments, the Court finds that Mr. Cantu's omission of the furniture on the Statement was material and fraudulent.   Mark Cantu is therefore denied a discharge under § 727(a)(4)(A).

(v)     **Testimony Regarding the Baldemar Perez Transfer**

As discussed below, Mark Cantu improperly transferred $50,000.00 to his friend Baldemar Perez in March 2009.   In addition to the improper transfer, Mr. Cantu also lied about the transfer under oath.

---

[49] Trial  Tr. 126-27 (day 1).

[50] Trial Tr. 127-28 (day 1).

[51] Trial Tr. 127 (day 1).

[52] Trial Tr. 127 (day 1).

[53] Trial Tr. 127-28 (day 1).

Around February 2009, Mr. Cantu settled his claims with the International Bank of Commerce, which had been the subject of an adversary proceeding.[54]   As a result of the settlement, Mr. Cantu received $150,000.00 from IBC.[55]  Mr. Cantu called Perez and invited him to drink scotch with him, at which time Mr. Cantu gave Perez a check for $50,000.00.

On March 19, 2009, at a hearing regarding the conversion of the Cantus' case to chapter 7, the Court asked Mr. Cantu what the $150,000.00 had been spent on.  Mr. Cantu, testifying under oath, responded that the money had been spent on payroll for his law office, a light bill, and an expert witness in a client's case.[56]  The Court then asked Mr. Cantu, "And there were no trips to Vegas and nothing like that?"[57]  Mr. Cantu responded, "Nothing like that, your Honor."[58]  Mr. Cantu did not mention that $50,000.00 had been paid, gratuitously, to his friend Baldemar Perez.

The Court did not find out about the transfer to Perez until April 15, 2009.[59]  At that time, the Court referred at a hearing to "the very first transaction, a check written to Baldemar Perez, none of us have heard of for [$]50,000."[60]

In response to an order from the Court, accountant George Stone prepared an analysis of where the $150,000.00 had been spent.[61]  According to Stone's analysis and Mr. Cantu's own

---

[54] *See* No. 08-07046, Doc. No. 15 (noting that the parties had announced a settlement agreement and dismissing the adversary proceeding for want of prosecution).

[55] Trial Tr. 66 (day 1).

[56] Trial Tr. 67-69 (day 1).

[57] Trial Tr. 68 (day 1).

[58] Trial Tr. 68 (day 1).

[59] Trial Tr. 81 (day 1).

[60] Trial Tr. 79 (day 1).

[61] Pls' Ex. 40; Trial Tr. 55-56, 70 (day 1).

admission, $50,000.00 went to Perez.  Another $45,000.00 went to the Cantus' bankruptcy attorney Ellen Stone.  The rest of the money went to an investigator, Mr. Cantu's car loans, the Cantus' home mortgage, and the employees at Mr. Cantu's law office.

The testimony regarding the transfer of estate funds was material to the bankruptcy case. Mr. Cantu's testimony was false, and Mr. Cantu knew it was false.  In response to pointed questions about where the money had been spent, he falsely answered that the money had gone to legitimate expenses rather than to his friend, Perez.  Mr. Cantu's excuse at trial was, "It just skipped my mind."[62]  It is not plausible that the deliberate transfer of one third of the settlement money could have "skipped" Mr. Cantu's mind, especially after Mr. Cantu had been directly asked where the money had gone.  In the context of Mr. Cantu's pattern of failures to disclose and concealment of assets, the Court finds that Mr. Cantu's intent was clearly fraudulent.  Mark Cantu's false testimony about the $50,000.00 transfer to Perez was a false oath.

Because of his false oaths concerning the Mar-Rox water damage cases, the contingency fee interests, the jewelry sales, the property held for others, and the Baldemar Perez transaction, the Court denies Mr. Cantu's discharge under § 727(a)(4)(A) and § 727(a)(7).

### B.  Improper Concealment and Transfers

Under § 727(a)(2)(B), a debtor is not granted a discharge if he "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed— . . . (B) property of the estate, after the date of the filing of the petition."  The Plaintiffs assert a claim under § 727(a)(2)(B) against the

---

[62] Trial Tr. 216 (day 1).

Cantus, alleging that they transferred, removed, or concealed property of the estate after the date of their bankruptcy filing.

The elements of a claim under § 727(a)(2)(B) are:  (1) a transfer, removal, destruction, mutilation, or concealment of property; (2) belonging to the estate; (3) after the bankruptcy petition was filed; and (4) performed with an intent to hinder, delay, or defraud a creditor or an officer of the estate.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 384 (Bankr. E.D. Tex. 2009); *see Pratt*, 411 F.3d 561, at 565 (listing the almost identical elements of a § 727(a)(2)(A) claim).

To determine whether the Cantus intended to hinder, delay, or defraud a creditor or officer of the estate, the Court examines the following factors: (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.  *Pratt*, 411 F.3d at 565.  "There is, moreover, a presumption of intent when a debtor transfers property to relatives.  This court has indicated that once this presumption attaches, the burden shifts to the debtor 'to demonstrate that he lacked fraudulent intent.'"  *Id.* at 565-66 (citations omitted).

The Plaintiffs proved that Mark Cantu:  (i) improperly concealed two bronze horses; (ii) improperly transferred $50,000.00 to Baldemar Perez; and (iii) improperly concealed and transferred settlement proceeds from Mr. Cantu's malpractice suit against Dr. Shah.  Any one of

these improper transactions would be sufficient to deny Mr. Cantu's discharge.   The Court examines each.

### (i)      The Bronze Horses[63]

In August 2005, Mark Cantu purchased two bronze horses in Las Vegas for $20,000.00.[64] The two horses were stored in bubble wrap in a storage unit at the University Inn.[65]  Mr. Cantu testified that he gifted the horses to his sister, Celeste Roach, in 2005.[66]

Roxanne Cantu, however, testified that the horses remained in storage at the University Inn until the time the property was foreclosed in January 2009.[67]  Ms. Cantu stated that she could not recall whether her husband had intended to give the horses to his sister, but her testimony directly contradicted his statement that the horses had been gifted in 2005.  She specifically remembered that at the time of the foreclosure, she and Mr. Cantu got permission from the bank to go onto the University Inn property and collect their personal property.[68]  They did not inform

---

[63] The issue of improper concealment of the bronze horses was tried by consent.  The Second Amended Complaint pleads a cause of action under § 727(a)(2)(B).  The joint pretrial statement listed among the contested issues of fact, "b. whether Debtors improperly transferred 2 bronze statutes/horses to his sister, Celeste Roach."  Doc. No. 29, at 2. The listing of the issue in the joint pretrial statement is evidence of trial by consent.  *See Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 65 n.2 (1st Cir. 2004) (holding that a § 727(a)(3) claim had been tried by consent when "both parties addressed § 727(a)(3) in the pre-trial report, and the bankruptcy court addressed this issue on summary judgment").

Furthermore, the Cantus did not object to questions and evidence regarding the bronze horses at trial.  The issue of improper transfer of the horses was plainly stated on the joint pretrial report and was addressed without objection at trial.  The evidence at trial indicated that the Cantus still owned the horses, and thus the Cantus' conduct is more properly characterized as improper concealment.  Because the improper concealment cause of action involves the same evidence, which was introduced without objection, the Court also concludes that improper concealment was tried by consent.

[64] Trial Tr. 119 (day 2); Doc. No. 53-5, at 4.

[65] Trial Tr. 119 (day 2).

[66] Trial Tr. 130 (day 1).

[67] Trial Tr. 119 (day 2).

[68] Trial Tr. 120 (day 2).

the bank that they were going to remove two bronze statutes.[69]  Roxanne and Mark Cantu then

took the horses to Celeste Roach's home.[70]  The Cantus never disclosed a gift of the horses on

any tax return.[71]

      Ms. Cantu testified at her deposition that the Cantus had planned to use the horses for

landscaping at the University Inn.[72]  The planned use of the horses for landscaping squarely

contradicts the story that the horses were a gift to Celeste Roach.

      Mr. Cantu's own testimony at his 341 meeting of creditors also contradicted his story at

trial.  At the 341 meeting, Mr. Cantu testified that the horses still belonged to him:

| | |
|---|---|
| **[Chapter 7 Trustee]** | But your sister has two statutes [sic]? |
| **[Mark Cantu]** | Horses— |
| **[Chapter 7 Trustee]** | That belong to you? |
| **[Mark Cantu]** | I didn't know where to store them. They're huge horses and she's got 20 acres so I put them out there. |
| **[Chapter 7 Trustee]** | They belong to you but they're at her house? |
| **[Mark Cantu]** | Right.[73] |

      The Court concludes that Mr. Cantu's testimony at the 341 meeting and Ms. Cantu's

testimony at trial are more credible than Mr. Cantu's trial testimony that he gave the horses to his

sister.  The horses were not transferred into Celeste Roach's possession until 2009, and even

then, they were never listed on a gift tax return.  The Cantus owned the horses in July 2008,

---

[69] Trial Tr. 125 (day 2).

[70] Trial Tr. 122 (day 2).

[71] Trial Tr. 122-23 (day 2).

[72] Trial Tr. 121 (day 2).

[73] Pls' Ex. A; Doc. No. 53-5, at 5.

when they filed their Amended Schedule B.[74]   However, the horses were not listed on the schedules filed in July 2008, nor on the amended schedules filed in January 2009.[75]

Although the Cantus remain the owners of the bronze horses, Mark Cantu improperly concealed the horses at his sister's house.  Because Mr. Cantu put the horses in the possession of his sister, a relative, a presumption of fraudulent intent arises.  *See The Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 698 (5th Cir. 2009) ("A presumption of actual fraudulent intent arises if the debtor transfers property gratuitously or to a relative.").  Mr. Cantu provided no evidence to rebut this presumption.  The contradiction in Mr. Cantu's stories about the horses is further evidence of his fraudulent intent.  His failure to correct the schedules in January 2009, when he had just moved the life-sized horses to his sister's property and would have been aware of their existence, is yet more proof that Mark Cantu intentionally hid the horses.

The failure to schedule the horses and the concealment of the horses on Roach's property constitute fraudulent concealment under § 727(a)(2)(B).  *See Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987) (holding that a debtor's failure to schedule a sixteen-foot boat constituted a fraudulent concealment).  Mark Cantu is therefore denied a discharge under § 727(a)(2)(B) for improperly concealing the bronze horses.

### (ii)   The Cash Transfer to Baldemar Perez

Mark Cantu also transferred money, in the middle of the bankruptcy case, to his close friend Baldemar Perez.  Out of the $150,000.00 settlement Mr. Cantu received from IBC, Mr. Cantu paid $50,000.00 to Baldemar Perez on March 3, 2009.[76]   Perez later returned the

---

[74] No. 08-70260, Doc. No. 136, at 2-8.

[75] No. 08-70260, Doc. No. 609, at 3-10.

[76] Trial Tr. 72 , 75 (day 1).

money to Mr. Cantu after the Court and the Trustee became aware of the transfer.[77]  Mr. Cantu

was not authorized by the Court to pay the money to Perez on account of any prepetition debt.[78]

The transfer of the funds warrants denial of Mark Cantu's discharge.

A gratuitous transfer gives rise to a presumption of fraudulent intent.  *Duncan*, 562 F.3d

at 698.  Mr. Cantu transferred the $50,000.00 gratuitously:

> **[Mr. Lumber]**        Did Mr. Perez hand anything back to you in
> exchange for the check?
>
> **[Mark Cantu]**        Three weeks later he gave me the $50,000
> back.
>
> **[Mr. Lumber]**        Did Mr. Perez hand anything to you at that
> time in exchange for the check?
>
> **[Mark Cantu]**        No.[79]

Mr. Cantu did not rebut the presumption of fraudulent intent.  Perez's return of the $50,000.00

and Mr. Cantu's later disclosure of the transfer on an MOR—after the Cantus' creditors had

brought the transfer to the Court's attention—do not show that the original transfer was not

fraudulent.

The additional evidence, far from rebutting the presumption of fraudulent intent,

confirms that Mr. Cantu transferred the money fraudulently.  Mr. Cantu and Perez are very close

friends.  They have known each other for over twenty years, and Perez "says he has loved [Mark

Cantu] like a son[.]"[80]  Mr. Cantu and Perez have gone on more than one vacation together.[81]

---

[77] Trial Tr. 76-79 (day 1).

[78] Trial Tr. 77 (day 1).

[79] Trial Tr. 76 (day 1).

[80] Trial Tr. 74 (day 1).

[81] Trial Tr. 75 (day 1); Trial Tr. 109 (day 2).

Mark Cantu deliberately concealed the transfer from the Court.  He failed to mention the transfer at a hearing, even when he was specifically questioned about what he had done with the $150,000.00 settlement money.[82]  Mr. Cantu admitted at trial that he had testified at a March 18, 2008 hearing that the money had been spent on his law office, particularly on the payroll; on a light bill for the Atrium, an office building that had been owned by the Cantus; and on an expert witness.[83]

The transfer occurred in the context of many other questionable transfers and omissions in the bankruptcy case.  Furthermore, the return of the funds to Mr. Cantu, after the Court and other parties found out about the transfer, is evidence that Mr. Cantu retained some degree of control over the funds even after the transfer.  The Court concludes that Mr. Cantu transferred the $50,000.00 with clear intent to hinder, delay, or defraud his creditors.  On the basis of the transfer to Perez, Mark Cantu is denied a discharge under § 727(a)(2)(B).

(iii)     The Shah Settlement Proceeds

Before filing for bankruptcy, Mark Cantu filed a medical malpractice case against Dr. Pankaj Shah, an ophthalmologist.[84]  Mr. Cantu hired attorney Kathy Julia to prosecute the lawsuit.[85]   In May of 2009, while he was in bankruptcy, Mr. Cantu settled the case for $34,000.00.[86]  He did not seek the Court's permission to hire special counsel to represent him in the lawsuit, and he did not disclose the settlement to the Court voluntarily.[87]

---

[82] Trial Tr. 66-70 (day 1).

[83] Trial Tr. 68-69 (day 1).

[84] Trial Tr. 171 (day 1).

[85] Trial Tr. 172 (day 1).

[86] Trial Tr. 172, 174 (day 1).

[87] Trial Tr. 172 (day 1).

When the Cantus' case was converted to chapter 7, Mr. Cantu did not provide any information about the settlement to the Trustee. Upon the Trustee's inquiry, Mr. Cantu wrote an email saying, "Those funds were received prior to the conversion."[88] The Court then entered an order requiring disclosure of the settlement and turnover of the proceeds.[89] By the time the Court issued the turnover order, Mr. Cantu had already spent all of the settlement money.[90]

The Court finds that Mark Cantu deliberately concealed the settlement funds. He failed to seek Court approval to hire special counsel, and he did not voluntarily provide information about the settlement to anyone. Mr. Cantu's evasiveness is evidence of fraudulent intent. His failure to disclose the settlement was an improper concealment of estate assets. His spending the money without disclosing the funds, without providing records of where the money went, and without authorization from the Court was an improper transfer of estate assets. The Court therefore denies discharge under § 727(a)(2)(B).

### (iv)    Other Allegedly Improper Transfers

Although the evidence shows that Mark Cantu used cash from the estate, including the cash collateral of Lone Star Bank, for personal expenses the Court finds insufficient evidence that the use of cash from the chapter 11 estate constituted improper transfers. While the Cantus were in chapter 11 bankruptcy, they were allowed to use funds from the estate to pay for personal living expenses. The evidence was clear that both Mr. Cantu and Ms. Cantu regularly removed cash from the estate properties, especially the University Inn and La Vista Mobile Home Park. As discussed below, their use of cash collateral at the University Inn violated lawful

---

[88] Trial Tr. 173 (day 1).

[89] Trial Tr. 173-74 (day 1); Pls' Ex. 47.

[90] Trial Tr. 174 (day 1).

cash collateral orders, but there is insufficient evidence that cash from the University Inn and La Vista was transferred or concealed with fraudulent intent.

Mark Cantu also engaged in a complex series of transfers involving revenues from the Dominion Apartments.  The Dominion Apartments ("Dominion") are owned by an entity called Canflor.[91]   The Cantus own Camflor, which is Canflor's general partner.[92]   After he filed bankruptcy, Mr. Cantu paid numerous personal expenses from Dominion's checking account, including bar dues, automobile insurance, law office expenses, a home mortgage payment, tuition for the Cantus' children, the Cantus' daughter's Volkswagen payment, and Mr. Cantu's Mercedes payment.[93]

Around 2008-2009, during the bankruptcy, Mark Cantu frequently used money from Dominion to pay his employees at the law office and to make his Mercedes payments.[94] Mr. Cantu transferred the money from Dominion to his general account and then used the money for payroll and the Mercedes payments.  The specifics of the transfers were not indicated on Mr. Cantu's Monthly Operating Reports.[95]   Mr. Cantu also failed to provide records of the payments to George Stone, his accountant.[96]   Dominion was not in bankruptcy, but the Cantus listed their interest in Dominion on the Mar-Rox schedules.[97]

---

[91] Trial Tr. 97 (day 1).

[92] Trial Tr. 97 (day 1).

[93] Trial Tr. 97-103 (day 1).

[94] Trial Tr. 107-09 (day 1).

[95] Trial Tr. 108-09 (day 1).

[96] Trial Tr. 110 (day 1).

[97] Trial Tr. 112 (day 1).

The Dominion transfers were suspicious and insufficiently documented.   Mr. Cantu attempted to explain, after being questioned on the specifics of the transfers:

> So can I show you specifically where I was taking money from one account and showing it and putting it in another account?  No, I can't.  Can I show you that the monies that were received from the Dominion Apartments were actually paid into my law office and Marc Cantu account and then were made payments—then I made payments from that account to payroll and to Mercedes Benz?  Yes, because those accounts are there.  Those checks are there.
>
> So the answer to your question is can I show you specifically.  No.  Can I show you generally what I did?  Yes.[98]

Although the transfers and Mr. Cantu's failure to provide information about Dominion to George Stone are troubling, Dominion was not in bankruptcy, and Mr. Cantu appears to have used the money for reasonably legitimate expenses.  The Court therefore finds insufficient evidence that the Dominion transfers were improper transfers under § 727(a)(2)(B).  However, as discussed below, Mr. Cantu's failure to keep sufficient records regarding Dominion warrants denial of discharge.

### C.  Refusal to Comply with Lawful Court Orders

Mark Cantu is denied a discharge under § 727(a)(6)(A) because of his refusal to comply with lawful court orders.  Mr. Cantu refused to comply with the following orders:  (i) the Court's October 19, 2009 order in the Cor-Can adversary prohibiting frivolous conduct; (ii) the Court's November 20, 2009 order in the Cantu bankruptcy prohibiting further interference with the administration of the bankruptcy cases; (iii) the Lone Star cash collateral orders; and (iv) the Court's September 30, 2009 order to turn over non-exempt property.

To warrant denial of discharge, the Plaintiffs must show that:  (1) the Court issued an order directed at the debtor; (2) the order was lawful; (3) the order was not one requiring a

---

[98] Trial Tr. 109 (day 1).

response to a material question or to testify; and (4) the debtor refused to obey the order. *Wells*, 426 B.R. at 608-09 (citing *Gillman v. Green (In re Green)*, 335 B.R. 181, 183 (Bankr. D. Utah 2005)). The use of the word "refused" implies that the debtor's lack of compliance must be "willful and intentional." *Id.* at 609. A bankruptcy court, in determining whether a debtor has "refused" to obey a court order, is given a great deal of discretion. *Yoppolo v. Walter (In re Walter)*, 265 B.R. 753, 758 (Bankr. N.D. Ohio 2001). Although this Court has substantial discretion in this area, Mr. Cantu's conduct was so blatant that the Court concludes that it would be an abuse of discretion to determine that Mr. Cantu had *not* willfully failed to comply with the Court's orders.

### (i) Frivolous Conduct

At the time the Cantus filed bankruptcy, they owned a 45% interest in Cor-Can, Inc. In October 2009, after the Cantu bankruptcy had been converted to chapter 7, the Court approved the sale of the Cantus' 45% interest to Tomas Corona.[99] Mark Cantu had earlier filed suit against Tomas Corona, and that suit was then removed to the Bankruptcy Court as an adversary proceeding, No. 09-7011.[100] The Court ruled on October 19, 2009 that the adversary proceeding was frivolous and issued an order that no further frivolous conduct would be tolerated.[101] The Court announced its findings in Mr. Cantu's presence, and also announced that it had signed the dismissal order.[102] The order was signed on October 19, 2009, and it was entered on October 21, 2009.

---

[99] Trial Tr. 147 (day 1).

[100] Trial Tr. 148 (day 1).

[101] Pls' Ex. 61; Trial Tr. 148 (day 1).

[102] Trial Tr. 152 (day 1).

On October 20, 2009, Mr. Cantu filed a notice of lis pendens against the Cor-Can property.[103]  At the time that he filed the notice of lis pendens, he knew that the adversary was dismissed as frivolous and that the dismissal order would be entered.[104]

The Trustee filed a motion for sanctions against Cantu and to compel withdrawal of the notice of lis pendens.[105]  At a hearing on October 29, 2009, in the presence of United States Marshals, the Court required Mr. Cantu to sign a document withdrawing the lis pendens, informing him that he would be required either to sign the withdrawal of the lis pendens or go to jail.[106]

After the Court had threatened Mr. Cantu with jail to persuade him to withdraw the lis pendens, Mr. Cantu wrote a letter to Diane Bartek of IBC.[107]  Mr. Cantu stated:

> I write this letter to advise you and your client, International Bank of Commerce, that I'm going to appeal Judge Isgur's order and that if your client, IBC, provides financing for Mr. Tomas Corona's purchase, they may very well find themselves in a lawsuit involving conspiracy charges against IBC for knowingly lending money to Mr. Corona when they're aware of the ongoing litigation. This letter serves to put you and IBC on notice so that there will be no questions about my feelings concerning this matter.[108]

---

[103] Trial Tr. 149 (day 1).

[104] Trial Tr. 157 (day 1).  At trial, Mr. Cantu alleged that, at the time he filed the notice of lis pendens, he was not aware of the dismissal order and its prohibition of frivolous conduct.  However, the Court determined during the trial that Mr. Cantu had been present at the hearing on October 19, 2009, when the Court announced its findings and signed the order.  After the Court made this determination, Mr. Cantu then admitted that he knew when he filed the notice of lis pendens that the Court had signed the order dismissing the adversary.  Trial Tr. 157 (day 1).

[105] No. 09-7011, Doc. No. 16.

[106] Trial Tr. 153 (day 1).

[107] Trial Tr. 157-58.

[108] Trial Tr. 158 (day 1).

Mr. Cantu thus attempted to interfere with the sale of estate property by threatening IBC with a lawsuit.  In November 2009, the Court awarded sanctions against Mr. Cantu for this conduct.[109] The Court vacated some of the sanctions, but none of them were ever paid.[110]

Mr. Cantu's actions in filing the notice of lis pendens and threatening IBC with suit constituted a refusal to comply with the Court's dismissal order.  The order clearly prohibited "[f]urther frivolous conduct."  Mr. Cantu was aware of the order.  However, he intentionally filed the notice of lis pendens based on a suit that had already been dismissed as frivolous. Mr. Cantu should have been aware that this action was decidedly the kind of frivolous conduct prohibited by the Court's order.  His failure to comply was knowing and willful.

Furthermore, Mr. Cantu's conduct in sending the letter to IBC was even more egregious. After the Court's threat of incarceration led to the withdrawal of the lis pendens, Mr. Cantu engaged in similar conduct—attempting to interfere with the sale of the property by threatening suit.  By the time he wrote the letter to IBC, Mr. Cantu was fully aware that further attempts to interfere with the sale of Cor-Can would be regarded as contemptuous.   He was fully aware that the Court's order prohibited frivolous conduct.  He nonetheless persisted in his efforts, and then failed to pay the sanctions that had been ordered by the Court.  The Court therefore finds that Mark Cantu knowingly and willfully refused to comply with the Court's dismissal order in the Cor-Can adversary.

### (ii)    Further Interference with the Sale of Estate Property

On November 20, 2009, after Mr. Cantu's conduct in connection with the Cor-Can property, the Court ordered Mr. Cantu to stop interfering with the administration of the

---

[109] Pls' Ex. 64; Trial Tr. 161.

[110] Trial Tr. 165 (day 1).

bankruptcy estate.[111]   The Court found that Mr. Cantu had engaged in conduct that "unnecessarily multiplied the proceedings in the [Cantu and Mar-Rox] Cases and therefore unreasonably increased the Estate's cost of administration.   Cantu has also unreasonably interfered with the Trustee's proper administration of these converted Cases.   The Court orders Cantu to cease and desist from further similar conduct."[112]   Cantu again refused to comply with the Court's clear orders that he cease interfering with the administration of the bankruptcy cases.[113]

On February 16, 2010, the Court authorized the sale of the Atrium.[114]   The Atrium is a four-story office building that was owned by the Cantus.  Mark Cantu had his law offices in the Atrium.[115]

After the Court authorized the sale of the Atrium, Mr. Cantu attempted to interfere with the sale in a similar manner to his interference with the Cor-Can sale.  Mr. Cantu sent a letter to Tony Villeda, the purchaser's attorney, warning, "Out of an abundance of caution, I am notifying you and your title company that this may have ramifications which may be at issue."[116]   The letter further noted, "Although a lis pendens has not been filed, this letter will serve as notice that

---

[111] Pls' Ex. 58.

[112] Pls' Ex. 58; No. 08-70260, Doc. No. 1478.

[113] The issue of Cantu's refusal to comply with the Court's cease-and-desist order, Pls' Ex. 58, was tried by consent. This issue was not pleaded in the Second Amended Complaint, nor was it listed in the pre-trial statement.  However, the Plaintiffs introduced the order into evidence without objection.  Trial Tr. 7 (day 1).  The Plaintiffs then questioned Mark Cantu extensively on the cease-and-desist order and his subsequent conduct, all without objection as to relevance.  Trial Tr. 166-71.  The testimony could have been relevant only to a § 727(a)(4)(A) cause of action for violating the cease-and-desist order.  The Cantus had an opportunity to present rebuttal evidence, and Mark had ample opportunity to explain his actions during direct examination and cross-examination.  The Court therefore concludes that Mark's refusal to comply with the cease-and-desist order was tried by consent.

[114] Pls' Ex. 59.

[115] Trial Tr. 166 (day 1).

[116] Trial Tr. 167 (day 1).

they may be buying nothing for $2.7 [million] unless, as I stated earlier, the title company is willing to roll the dice on that amount of money."[117]  Mr. Cantu also sent a courtesy copy to Southern Title, the title company that was providing the abstract for the title insurance.[118]

Mr. Cantu's violation of the cease-and-desist order was even more blatant than his violation of the order prohibiting further frivolous conduct.  Mr. Cantu had already been sanctioned for similar conduct in the Cor-Can adversary.  He was specifically warned against interference with the administration of the estate.  Yet he deliberately threatened the purchaser of the Atrium and the title company with a lawsuit, apparently in an attempt to prevent or delay the closing.  His conduct was unambiguously interference in the administration of the estate.  The Court therefore finds that Mark Cantu knowingly and willfully refused to comply with the lawful cease-and-desist order.

### (iii)    Cash Collateral Orders

Prior to bankruptcy, the Cantus had taken out loans with Lone Star Bank ("Lone Star") in the amount of approximately $8 million.[119]  Pursuant to the loan agreement, Lone Star had a security interest in several pieces of real property and any rents generated by the property.  After the Cantus filed for bankruptcy, they entered into two agreed orders on the use of Lone Star's cash collateral.

The first agreed order on Lone Star's cash collateral was entered on June 13, 2008.[120] The authorization to use cash collateral ended on July 23, 2008.[121]  Another agreed order was

---

[117] Trial Tr. 170 (day 1).

[118] Trial Tr. 170 (day 1).

[119] Trial Tr. 27 (day 1).

[120] No. 08-70261, Doc. No. 50.

[121] No. 08-70261, Doc. No. 50, at 2.

entered on September 3, 2008.[122]  The September 3, 2008 cash collateral order's authorization ended on September 17, 2008.[123]

The orders conditioned the Cantus' use of Lone Star's cash collateral, which included the rents on the University Inn, some rental houses, and other properties.[124]  The orders stated that the Cantus had no right to collect or use any of the rents, profits, or other proceeds generated by the properties except as provided in the cash collateral order and in the loan documents.[125]

The cash collateral orders required the debtors to open debtor in possession (DIP) accounts with Lone Star and to segregate and deposit all rents in the DIP account.[126]  The debtors were not allowed to use the rents at all after the second order's authorization expired on September 17, 2008.[127]  The Cantus were not, at any time after the entry of the order, allowed to remove cash rents directly from the hotel's drawer.  After the authorization expired, they were not allowed to use any cash rents, proceeds, or profits.

Lone Star was authorized, pursuant to the cash collateral order, to inspect the records at the University Inn and the other properties.[128] Lone Star inspected records of the University Inn

---

[122] No. 08-70261, Doc. No. 229.

[123] Other cash collateral orders were entered in the Cantu's bankruptcy and in the Mar-Rox bankruptcy, including orders concerning the cash collateral of IBC, No. 08-70261, Doc. Nos. 139, No. 08-70260, Doc. No. 227; Compass Bank, No. 08-70260, Doc. No. 218; and Bayview Loan Servicing, LLC, No. 08-70261, Doc. Nos. 60, 82, 199, 231 & 237, No. 08-70260, Doc. No. 638.  The evidence at trial focused on the Cantus' use of the cash collateral associated with the University Inn, which was the subject of the Lone Star cash collateral orders.

[124] *See* No. 08-60261, Doc. Nos. 13 & 50.

[125] No. 08-70261, Doc. No. 50, at 2; No. 08-70260, Doc. No. 229, at 2.

[126] No. 08-70261, Doc. No. 50, at 2-3; No. 08-70260, Doc. No. 229, at 2-3.

[127] No. 08-70260, Doc. No. 229, at 2-3.

[128] No. 08-70261, Doc. No. 50, at 4; No. 08-70260, Doc. No. 229, at 4-5.

around July or August of 2008.[129]  Lone Star later obtained records from September and October of 2008.[130]

Among the records were receipts showing that cash had been taken out of the University Inn, including $2,521.00 in September and about $2,600.00 in October.[131]  The bank found that the Cantus, particularly Roxanne Cantu, had been taking out cash from the hotel's petty cash drawer.[132]  Ms. Cantu periodically took out "usually from [$]100 to $500, sometimes more."[133]

The bank's initial review of records did not show a shortfall between the rents collected and the rents deposited in the DIP accounts.[134]  Lone Star later found a shortfall of $200.00-$300.00 on rental homes.[135]  Lone Star did not begin to collect the rents on the rental homes until after the bank foreclosed on the properties.[136]  Lone Star later filed an administrative claim against the Cantus, alleging that the Cantus had used rents, profits, and proceeds belonging to the bank for personal expenses.[137]  The bank's claim was for $155,628.39.  The Cantus and Lone Star settled the claim in the spring of 2009, after the foreclosure of the hotel.[138]  The Cantus agreed to pay the claim, although Lone Star's factual allegations remained in dispute.[139]

---

[129] Trial Tr. 16 (day 1).

[130] Trial Tr. 18-19 (day 1).

[131] Trial Tr. 19, 32 (day 1).

[132] Trial Tr. 19, 32 (day 1).

[133] Trial Tr. 32 (day 1).

[134] Trial Tr. 22 (day 1).

[135] Trial Tr. 23 (day 1).

[136] Trial Tr. 25 (day 1).

[137] Trial Tr. 34-35.

[138] Trial Tr. 36-38.

[139] Trial Tr. 38, 43 (day 1).

The Court finds that Mark Cantu refused to comply with the agreed orders regarding Lone Star's cash collateral.[140]   The cash collateral orders were lawful and did not require a response to a material question or to testify, and therefore Mr. Cantu's noncompliance warrants denial of discharge if it was willful and intentional.

As discussed above, the Lone Star cash collateral orders required the Cantus to set up DIP accounts and to deposit all rents from the University Inn, the rental homes, and the other properties into the accounts.   After the authorization for use of the cash collateral expired, the Cantus were not allowed to use the rents from the University Inn.   However, Mr. Cantu continued to use petty cash from the University Inn and failed to deposit funds in the DIP accounts.

Although the evidence showed that Ms. Cantu removed more cash than Mr. Cantu from the University Inn, Mr. Cantu also removed cash.   Mr. Cantu admitted at trial that he had removed "a hundred and fifty or $250" from the University Inn.[141]   Ms. Cantu testified that Mr. Cantu regularly went to the University Inn and took out cash.[142]   According to Ms. Cantu, Mr. Cantu took approximately $50 to $100 on each occasion.[143]   The Cantus were unable to produce exact records of the cash that had been withdrawn.   The Cantus also failed to deposit at least $200.00-$300.00 in rental income in the DIP accounts each month.[144]

The cash collateral orders were lawful, and they did not require a response to a material question or to testify.   The orders were clear.   Mr. Cantu was not permitted to remove *any* cash

---

[140] No. 08-70261, Doc. No. 50; No. 08-70260, Doc. No. 229.

[141] Trial Tr. 114 (day 1).

[142] Trial Tr. 111 (day 2).

[143] Trial Tr. 111 (day 2).

[144] Trial Tr. 23 (day 1).

from the University Inn, not even in small amounts. He was also required to ensure that the $200.00-$300.00 in rental income was deposited in the DIP accounts. Mr. Cantu, as an attorney, was aware of the significance of the cash collateral orders.[145] His failure to comply with the orders was willful and intentional, and the Court therefore denies his discharge under § 727(a)(7), for failure to comply with the cash collateral order entered in the Mar-Rox case, and under § 727(a)(6)(A), for failure to comply with the cash collateral order entered in the Cantus' individual case.

### (iv)   Order to Turn Over Non-Exempt Property

Mark Cantu also deliberately failed to comply with the Court's order to turn over non-exempt property.[146] The order, which was entered on September 30, 2009, required the Cantus to turn over physical possession of all non-exempt property to the Trustee within five days of the entry of the order.[147] Mr. Cantu did not turn over the property within five days.

On October 13, the Trustee went to Mr. Cantu's law office at the Atrium to take the non-exempt property there.[148] The Trustee moved all the furniture out of the Cantu law office's space to an empty space across the hall.[149] He then changed the locks on the space where the furniture was stored.[150]

---

[145] Trial Tr. 112-13 (day 1).

[146] Pls' Ex. 52; Trial Tr. 176 (day 1).

[147] Pls' Ex. 52, at 1; Trial Tr. 176 (day 1).

[148] Trial Tr. 31 (day 2).

[149] Trial Tr. 31-32 (day 2).

[150] Trial Tr. 31-32 (day 2).

While the Trustee was moving the furniture, Mr. Cantu walked in and told the Trustee that Judge Crane of the District Court had issued a temporary restraining order on the move.[151] The Trustee checked with Judge Crane and found out that Judge Crane had denied Mr. Cantu's application for a temporary restraining order.

The Trustee also had difficulty removing Mr. Cantu's non-exempt artwork from the walls of the office.  A security company (Art Line) was responsible for the artwork's security.[152]  The artwork was secured by a special frame with an alarm system.[153]  Mr. Cantu had been ordered to facilitate the turnover of the art by having Art Line disable the security system.[154]  However, Mr. Cantu did not cooperate with the removal of the artwork.[155]

Mr. Cantu's failure to turn over the property and his subsequent efforts to prevent the Trustee from taking the property were a deliberate and willful violation of the Court's turnover order.  The failure to turn over the property, two weeks after the entry of the order, was not inadvertent.  Mr. Cantu's application for a temporary restraining order shows that he was aware of the existence and requirements of the turnover order.  Even after the application for a TRO was denied, however, Mr. Cantu refused to comply with the turnover order.  He lied about the existence of a TRO, and he also failed to comply with specific orders to facilitate the removal of artwork.  The turnover order was lawful, and Mr. Cantu's refusal to comply warrants denial of discharge.

---

[151] Trial Tr. 32 (day 2).

[152] Trial Tr. 33 (day 2); Pls' Ex. 56.

[153] Trial Tr. 33 (day 2).

[154] Pls' Ex. 56.

[155] Trial Tr. 34 (day 2).

### (v)        Orders to Compel Production

The Plaintiffs also allege that Mr. Cantu refused to comply with lawful orders to compel production of financial documents and post-conversion contingency fee contracts.  The Cantus were compelled to produce all records of living expenses.[156]  In response, Mr. Cantu produced a two-page list of checks.[157]  The Cantus had numerous other records of their living expenses, including the Dominion check register, which was introduced at trial as the Plaintiffs' Exhibit 39.[158]  However, the Cantus never provided any Dominion records except a rent roll.[159]

As an attorney, Mr. Cantu was well aware that the order required more than a two-page list, and he could have obtained more extensive records.  Mr. Cantu was responsible for the Dominion transfers, and he should have known how to obtain the check register.  Nevertheless, the Court concludes that this issue—standing alone—would not justify the denial of Mr. Cantu's discharge.

The Court also finds that the Plaintiffs did not prove that Mr. Cantu failed to produce any particular post-conversion contingency fee contracts.  Although it is unlikely that the Cantu law office did not have any post-conversion contingency fee contracts, the Court does not deny Mark Cantu's discharge on the basis of such an assumption.

---

[156] Trial Tr. 96 (day 1).

[157] Trial Tr. 96 (day 1).

[158] *See* Trial Tr. 98 (day 1).

[159] Trial Tr. 51 (day 2).

### (vi)    Order to Delineate Rental Space at the Atrium

In 2009, the Court ordered Mark Cantu to delineate rental space at the Atrium.[160]  At the time, Mr. Cantu's law office occupied approximately half of the fourth floor of the Atrium.[161]  The Court ordered Mr. Cantu to reduce his occupancy to only one third of the fourth floor.[162]

The Plaintiffs questioned Mr. Cantu about his compliance with this order at trial, and Mr. Cantu testified that he complied "[n]ot willingly, but—or voluntarily, but I complied with what he ordered."[163]  The Trustee testified that Mr. Cantu did not pay rent for the Atrium until October 2009, but he did not testify that Mr. Cantu failed to delineate office space.[164]  The testimony indicates that Mr. Cantu complied with the order reluctantly and with some delay.  However, the Court finds that the Plaintiffs failed to prove that Mr. Cantu refused to comply with the order to delineate office space.  The issue of whether Mr. Cantu refused to comply with the order to pay rent was neither pleaded nor listed on the pre-trial statement.  Even assuming the issue was tried by consent, the Court finds that the Plaintiffs did not prove that Mr. Cantu's failure to pay rent until October 2009 was willful and intentional.

The Court therefore does not deny Mark Cantu's discharge for failure to comply with the order to delineate office space or for failure to produce post-conversion contingency fee contracts.  However, the Court denies Mark Cantu's discharge under § 727(a)(6)(A) and § 727(a)(7) for his failure to comply with the Cor-Can dismissal order, the cease-and-desist order, the Lone Star cash collateral order, and the order to turn over non-exempt property.

---

[160] Trial Tr. 166-67, 175 (day 1).

[161] Trial Tr. 167 (day 1).

[162] Trial Tr. 167, 175 (day 1).

[163] Trial Tr. 175-76 (day 1).

[164] Trial Tr. 76 (day 2).

### D.  Failure to Keep Records

The Cantus also failed to keep adequate records, and their failure to keep records prevented the Plaintiffs from ascertaining the Cantus' financial condition.  The Plaintiffs allege numerous failures to keep records.[165]  The Court denies Mark Cantu's discharge for his failure to keep records of:  (i) the Dominion transfers; (ii) cash withdrawals from La Vista; and (iii) the Mar-Rox water damage cases and contingency fee interests.

To justify denial of discharge for failure to keep adequate financial records under § 727(a)(3), a plaintiff must show that (1) the debtor failed to keep and preserve financial records; and (2) this failure prevented the plaintiff from ascertaining the debtor's financial condition.  *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003).  "A debtor's financial records need not contain 'full detail,' but 'there should be written evidence' of the debtor's financial condition."  *Id.* (quoting *Goff v. Russell (In re Goff)*, 495 F.2d 199, 201 (5th Cir. 1974)).

---

[165] Most of the alleged conduct took place after the Cantus filed their bankruptcy petition and before their case was converted to chapter 7.  Although no party raises the issue, the Court considers whether post-petition failures to maintain records warrant denial of discharge under § 727(a)(3).  The Court concludes that § 727(a)(3) also applies to a debtor-in-possession's failure to keep financial records.  By its terms, § 727(a)(3) applies to records "from which the debtor's financial condition" might be ascertained.  In § 727(a)(2), dealing with improper transfers, the statute uses the term "property of the debtor" when referring to pre-petition transfers, and it uses "property of the estate" when referring to post-petition transfers.  The Court reads the distinction in § 727(a)(2) as ensuring that subsection (a)(2) applies to both pre-petition and post-petition conduct.  Upon filing for bankruptcy, the debtor's property becomes property of the estate; therefore, different language is needed to denote the relevant assets pre- and post-petition.

The language in subsection (a)(3), however, does not require a similar clarification.  Subsection (a)(3) does not limit its application to pre-petition conduct, and the term "debtor's financial condition" does not necessarily exclude records relating to a debtor-in-possession's financial condition.  Other courts have assumed that when a debtor, post-petition, has destroyed or failed to keep adequate records, discharge should be denied under § 727(a)(3).  *E.g.*, *In re Krehl*, 86 F.3d 737, 740-41, 744 (7th Cir. 1996) (affirming denial of an individual debtor's discharge under § 727(a)(7) because he destroyed the records of a debtor-corporation, of which he was an insider, while that corporation was in bankruptcy); *Cruse v. Yates (In re Yates)*, 429 B.R. 675, 680-81 (Bankr. E.D. Mo. 2010) (denying discharge where debtor failed to provide adequate records of post-petition livestock sales); *Brandt v. Carlson (In re Carlson)*, 231 B.R. 640, 654-55 (Bankr. N.D. Ill. 1999) (denying discharge where debtor failed to keep, among other records, canceled checks from his debtor-in-possession account).

Once the plaintiff has met the initial burden, the debtor must prove that the inadequacy of the records is "justified under all the circumstances." *Id.* (quoting *Grant v. Sadler (In re Sadler)*, 282 B.R. 254, 263 (Bankr. M.D. Fla. 2002)). Some factors the Court may consider in determining whether the Cantus' failure to produce records was justified include: (1) their education; (2) their sophistication and business experience; and (3) any special circumstances that may exist. *Hill v. Jones (In re Jones)*, 327 B.R. 297, 305 (Bankr. S.D. Tex. 2005).

### (i)   Dominion Transfers

Although the evidence regarding Mark Cantu's use of Dominion funds was not clear enough to establish any improper transfers, the evidence was abundant that Mr. Cantu failed to keep adequate records of the transfers of funds from Dominion to the law office. At trial, Mr. Cantu was questioned extensively regarding the use of Dominion funds to pay his employees and to make payments on his Mercedes. Mr. Cantu's explanations were circuitous and vague, and his failure to provide an explanation to George Stone, his accountant, is suspicious. When a transaction appears to be unduly complex and the debtor fails to explain it, courts have found that the debtor failed to keep adequate records:

> The debtor presumably knows why what is usually a simple matter (either the purchase of a condominium or an intrafamily gift) has taken on such a byzantine character. To the extent that the debtor can explain these events he has an obligation to come forward and do so—he cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation.

*First Fed. Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 888 (7th Cir. 1983).

Mr. Cantu's use of the Dominion funds to make his Mercedes payment, with the funds passing through the Cantu law office accounts, had an eminently "byzantine character." The nature of the transactions was unclear on the Monthly Operating Reports. Mr. Cantu was in the

best position to explain the nature of the transactions at the time that they occurred, and he failed to do so. Instead, he "abuse[d] the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation." *Id.* Mr. Cantu did not keep or preserve records that would have enabled the Trustee and the other Plaintiffs to ascertain the nature of these transactions. When the Cantus' case was converted to a case under chapter 7, the only Dominion document the Trustee received was a rent roll list.[166]

Because of the inadequacy of the records regarding the Dominion transfers, the Court cannot determine where the money came from and how the money was used. This information was essential to ascertaining Mark Cantu's financial condition. However, Mr. Cantu failed to keep adequate records of the Dominion transfers. As an experienced attorney and businessman, he was not justified in doing so. The Court denies discharge under § 727(a)(3).

### (ii)    Cash Withdrawals from the University Inn and La Vista

Mark Cantu also failed to keep adequate records of his use of other cash from the estate. Mr. Cantu regularly removed cash from both the University Inn and La Vista. Although he testified that he and Ms. Cantu kept receipts at the University Inn for all the withdrawn cash,[167] they never turned over these receipts to the Trustee. They provided no evidence at trial that such receipts had ever existed, and no evidence that cash withdrawal records were kept and preserved. Instead, the Cantus' testimony was inconsistent, uncertain, and vague. Neither Mr. Cantu nor Ms. Cantu seemed to know whether and in what form the records had been preserved. The Court concludes that the Cantus did not keep adequate records of cash withdrawals, and if they did keep such records, they failed to preserve the records.

---

[166] Trial Tr. 51 (day 2).

[167] Trial Tr. 204 (day 1).

Mark Cantu initially testified at trial that the University Inn records had been handed over to Lone Star during the foreclosure of the property:

> **[Mr. Lumber]**        Mr. Cantu, before we broke for lunch we were talking a little bit about the University Inn petty cash.
>
>        Do you recall that?
>
> **[Mark Cantu]**        Yes.
>
> **[Mr. Lumber]**        But I think your testimony was that whenever you took money from the University Inn you always got a receipt.  True?
>
> **[Mark Cantu]**        True.
>
> **[Mr. Lumber]**        Okay.   We asked you in a request for production in this case for all records reflecting the date and amount of all cash and cash equivalents taken by you from the University Inn Motel while you were under Chapter 11.
>
>        What was your answer?
>
> **[Mark Cantu]**        "None at this time."
>
> **[Mr. Lumber]**        And there is no supplemental answer when receipts of cash taken from University Inn were ever produced.  Is that true?
>
> **[Mark Cantu]**        Well, because my trustee had already gotten and the bank had already taken everything and they had taken all the records.  I didn't have any at that time, and I continue not—I don't have any at this time; just the ones that you all produced.[168]

Later, the Court questioned Mr. Cantu to determine how the withdrawals of cash from the University Inn could have been ascertained from the MORs.[169]  The Court asked, "But if— and, then, since these were done by an accountant, who says he never got those receipts, how

---

[168] Trial Tr. 116-17 (day 1).

[169] Trial Tr. 199-204 (day 1).

could it be reported here?"[170]  In response, Mr. Cantu was unable to explain how anyone would

have been able to determine how much money had been withdrawn:

> **[The Court]**       So, I guess, then, how do I tell that it was reported to the CPA?  Because he said he didn't see those.

> **[Mark Cantu]**       Well, he never saw the cash—the cash receipts.

> **[The Court]**       But you're saying it hit the general ledger of some sort?  It hit the QuickBooks?

> **[Mark Cantu]**       It hit the general ledger, and then—and then we took it out from the general ledger.  In other words—

> **[The Court]**       So you're saying it's on the QuickBooks.

> **[Mark Cantu]**       It should be on the QuickBooks.

> **[The Court]**       Okay.  Are they here?  Do we have the QuickBooks?

> **[Mark Cantu]**       I don't know if the hotel had QuickBooks, your Honor.  I think the QuickBooks were just for the law office.

> **[The Court]**       Well, then, if it wasn't on the QuickBooks, what was it on?  It had to be on something given to the accountant or he's never going to find it, right?  So what was he given to show that $2,500?

> **[Mark Cantu]**       My check registers and my deposit.

> **[The Court]**       It wouldn't be on a check register because it was cash.

> **[Mark Cantu]**       Oh.[171]

---

[170] Trial Tr. 204 (day 1).

[171] Trial Tr. 204-05 (day 1).

Mr. Cantu's answers make it clear that he did not know how any records of the cash withdrawals were being kept. The cash withdrawals were not recorded on the check register, and he was unaware of whether the hotel's transactions were reported anywhere else:

> **[Mark Cantu]**      . . . . So, [the hotel] was making anywhere from like $1,200 to as much as $1,500 per day. That was always reported. Now, in the—
>
> **[The Court]**      Reported on what and to whom?
>
> **[Mark Cantu]**      To George Stone.
>
> **[The Court]**      In what—on the check register?
>
> **[Mark Cantu]**      On the check register and on the QuickBooks, if we had QuickBooks. I really don't know if we had QuickBooks or not.
>
> [ . . . ]
>
> **[The Court]**      Who's going to know that?
>
> **[Mark Cantu]**      My wife. I was in charge of the law office.
>
> **[The Court]**      Okay.
>
> **[Mark Cantu]**      She was in charge of the hotels and everything else. So, she was the one that was running—her and Rick Gill and Sandy were the ones that were running it. So, if there was QuickBooks—and I'm sure—I'm almost sure that there was, your Honor, but I don't want to say here that there was or there wasn't. All—
>
> **[The Court]**      Do the QuickBooks records still exist? Did you all keep them?
>
> **[Mark Cantu]**      The—I don't know, your Honor. I think we did. I don't—I'm not sure. I don't know if they did or didn't.[172]

---

[172] Trial Tr. 206-07 (day 1).

Ms. Cantu testified on the second day of the trial, and she, like Mr. Cantu, could not provide a satisfactory or convincing account of the hotel's records.  She did not know what had happened to any receipts of cash withdrawals:

> **[Mr. Lumber]**　　　Do you know how much money you took in cash from the University Motel?
>
> **[Roxanne Cantu]**　　　Whatever is indicated.  It was always—they always got a receipt.  I always signed out for what I got.
>
> **[Mr. Lumber]**　　　Okay.  Do you have copies of any of the receipts that you signed out for what you got?
>
> **[Roxanne Cantu]**　　　No.
>
> **[Mr. Lumber]**　　　Do you know where the receipts are for what you got?
>
> **[Roxanne Cantu]**　　　No.[173]

She later admitted that she did not know where the receipt book was:

> **[Mr. Lumber]**　　　Now, there was a receipt book at the University Inn into which all disbursements were to be recorded, true?
>
> **[Roxanne Cantu]**　　　True.
>
> **[Mr. Lumber]**　　　Do you know where that receipt book is?
>
> **[Roxanne Cantu]**　　　No.
>
> **[Mr. Lumber]**　　　Do you know if it's ever been provided to any of the creditors in bankruptcy?
>
> **[Roxanne Cantu]**　　　No, I don't know.
>
> **[Mr. Lumber]**　　　Do you know if it was ever provided to Mr. Schmidt?
>
> **[Roxanne Cantu]**　　　No.

---

[173] Trial Tr. 109 (day 2).

> **[Mr. Lumber]**        But there was a receipt book that you all would fill out when you would take money?
>
> **[Roxanne Cantu]**        As far as I know, yes.[174]

The University Inn generated approximately $38,000.00 per month.[175]  It was a fairly complex business.  After July 2008, the rents, profits, and proceeds of the business were the subject of cash collateral orders.  Detailed records of cash withdrawals were necessary not only for effective business management, but also for compliance with the cash collateral orders.

Yet the Cantus, if they ever kept records of cash withdrawals, did not preserve the records.  By the time of the trial, neither Mr. Cantu nor Ms. Cantu knew where the University Inn records were.  Mr. Cantu testified that Lone Star had taken the records.[176]  Ms. Cantu, however, did not mention that Lone Star took the records, testifying simply that she did not know where the receipt book was.[177]  Even if Lone Star took control of University Inn records, the Cantus were still required to account for how they had used the cash collateral at the hotel before the foreclosure.  Therefore, they should have preserved their own records of the cash withdrawals.  They did not preserve the records, and the Trustee never received a copy of the University Inn records.  The Trustee stated, "I got no records.  Nothing with regard to the University Inn.  It was foreclosed prior to the conversion . . . . and I got nothing."[178]

---

[174] Trial Tr. 113 (day 2).

[175] Trial Tr. 206 (day 1).

[176] Trial Tr. 116 (day 1).

[177] Trial Tr. 113 (day 2).

[178] Trial Tr. 51 (day 2).

Mr. Cantu similarly failed to keep and preserve records of cash withdrawals from La Vista.  Mr. Cantu admitted that he took cash from La Vista.[179]  Mr. Cantu said that he was given receipts every time he took money from La Vista.[180]  He testified that the Trustee took all the receipts and books relating to La Vista after the Cantu' case was converted to chapter 7.[181]  After the conversion, Mr. Cantu did not keep any of the receipts.[182]  Despite Mr. Cantu's account that the Trustee received all the La Vista books and records, the Trustee testified that he received nothing but a rent roll list.[183]  The Court finds the Trustee's testimony on this issue to be credible and finds that the Cantus' testimony is not credible.

The Cantus' failure to keep records of the cash withdrawn from La Vista and the University Inn prevented the Plaintiffs from ascertaining the true state of the Cantus' financial affairs.  As discussed above, the Court found insufficient evidence that the cash transfers from La Vista and the University Inn were improper transfers.  However, the lack of evidence was largely due to the incomplete records of the withdrawn cash.  The Cantus cannot escape denial of discharge under § 727(a)(2)(B) by failing to keep and preserve records of potentially improper conduct.  The testimony was clear that the withdrawal of cash had been extensive, and the lack of records prevented both the Plaintiffs and the Court from determining the full extent.

The Cantus did not provide a reasonable justification for their failure to keep and preserve records of their cash withdrawals.  The Cantus are educated, experienced business

---

[179] Trial Tr. 120 (day 1).

[180] Trial Tr. 120 (day 1).

[181] Trial Tr. 121 (day 1).

[182] Trial Tr. 122 (day 1).

[183] Trial Tr. 51 (day 2).

people, and Mr. Cantu is a practicing attorney.  Both were capable of keeping and preserving records of cash withdrawals.  Their failure to do so was not justified.

Mark Cantu is denied his individual discharge for the failure to keep records of cash withdrawals from La Vista.  Both Ms. Cantu and Mr. Cantu had a duty to keep and preserve records at the University Inn and La Vista.  If Mr. Cantu's failure to keep University Inn or La Vista records was based on a justifiable reliance on Ms. Cantu to keep the records, then Mr. Cantu would not lose his discharge for that particular failure.  *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1403 (9th Cir. 1990) ("We hold that when a married couple shares a duty to maintain records under § 727(a)(3), the bankruptcy court should not refuse to consider one spouse's reliance on the other in determining whether a failure to keep records was justified under all the circumstances of the case.").

To determine whether reliance on one's spouse is justified, the court should consider, among other relevant factors, (1) the debtor's intelligence and educational background; (2) his experience in business matters; (3) the extent of his involvement in the businesses for which discharge is sought; (4) his reliance on his spouse to keep records, including what, if anything, he saw or was told that indicated his spouse was keeping records; (5) the nature of the marital relationship; and (6) any recordkeeping or inquiry duties imposed upon the debtor by state law. *Id.* at 1404 n.5.

Mr. Cantu is an experienced, intelligent attorney.  However, Ms. Cantu is also an extremely capable businesswoman.  She was more responsible than Mr. Cantu for running the University Inn and other businesses, and Mr. Cantu testified that he believed his wife had

maintained the records at the hotel.[184]   The Court therefore finds that Mr. Cantu's reliance on Ms. Cantu to keep records of at the University Inn was justified.

Mr. Cantu was, however, responsible for the cash withdrawals from La Vista, and he did not testify that he had relied on Ms. Cantu to maintain the La Vista records.  The Court therefore finds that, regardless of whether such reliance would have been justified, Mr. Cantu did not rely on Ms. Cantu to maintain the La Vista records.

The unjustified failure to keep records of cash withdrawals from La Vista prevented the Plaintiffs from ascertaining the Cantus' financial condition.  The Court denies discharge under § 727(a)(3).

### (iii)   Mar-Rox Water Damage Cases and Contingency Fee Interests

Mr. Cantu failed to keep and preserve adequate records of the Cantus' interest in the Mar-Rox water damage cases and the Cantu law office's interest in the contingency fees from the Abigail Moreno Case and the Summit Sports Club case.  Mr. Cantu failed to schedule the water damage cases and the contingency fee interests on his schedules.[185]   He did not disclose either the water damage cases or the contingency fee interests to the Trustee.  The Trustee did not find out about the cases until Mark Gravely, Mr. Cantu's lawyer, contacted him.[186]

Mr. Cantu testified that he failed to list or disclose the water damage cases because he thought the cases had settled.[187]   He said that he failed to disclose the Abigail Moreno case because "we didn't get any money."[188]   In fact, contrary to Mr. Cantu's testimony, the estate did

---

[184] Trial Tr. 206-07 (day 1).

[185] Trial Tr. 141-46 (day 1).

[186] Trial Tr. 141, 146-47 (day 1).

[187] Trial Tr. 189 (day 1).

[188] Trial Tr. 221-22 (day 1).

receive a $6,600.00 referral fee in the Abigail Moreno case.[189]  He did not provide an explanation for why he failed to schedule the Summit Sports Club case.

Although the Court does not find Mr. Cantu's testimony particularly credible, his pattern of excuses that he "forgot" or had inaccurate knowledge of the outcome of the cases is evidence that he failed to keep adequate records of the cases.  Mr. Cantu provided a stack of contingency fee contracts to the Trustee, but Mr. Cantu's stack of contracts did not include any information about the Abigail Moreno Case or the Summits Sports Club case.[190]  The omission of the two cases from the information provided to the Trustee is evidence that Mr. Cantu had insufficient records of the cases.  Mr. Cantu's failure to keep records of the contingency fee cases is further evidenced by his failure to include them on a list of cases of significant value in his portfolio.[191]

The cases produced around $55,000.00 for the Cantu and Mar-Rox bankruptcy estates.  The Abigail Moreno and Summit Sports Club cases resulted in $25,100.00 in referral fees for the Cantu estate.  The water damage cases netted approximately $30,000.00 for the Mar-Rox estate.  Mr. Cantu's failure to keep and preserve adequate records of the water damage cases and the contingency fee interests therefore prevented the Plaintiffs from ascertaining the Cantus' true financial condition.

As an attorney, Mr. Cantu was well aware of the need to keep accurate records of his law offices' receivables.  He was also aware of the need to keep records of the Mar-Rox estate's interests in the water damage cases.  The failure to keep and preserve such records was not justified, and the Court denies Mark Cantu's discharge under § 727(a)(3) and § 727(a)(7).

---

[189] Trial Tr. 56 (day 2).

[190] Trial Tr. 52 (day 2).

[191] Pls' Ex. 74; Trial Tr. 145-46 (day 1).

(iv)     **Other Alleged Failures to Keep and Preserve Records**

The evidence is unclear as to whether the Cantus failed to keep and preserve adequate records of their jewelry sales.  As discussed above, the Cantus sold $134,575.00 in jewelry in the two years preceding bankruptcy.  The evidence indicates that the Cantus may have kept some type of records, and they also knew that the information was readily available from the jewelers:

> **[Mr. Kasofsky]**     In regards to your jewelry sales consignments, what kind of records did you keep on that?
>
> **[Mark Cantu]**     Regency Jewelers and [Shannon] were the ones that got those—the records, that had the records.  I believe that they subpoenaed them.  And my wife provided some records, and I provided them to the trustee.[192]

Debtors are not required under § 727(a)(3) to keep records in full detail.  The jewelry sales were not complex business transactions, and the Cantus apparently knew how to obtain more detailed information.  Mr. Cantu did not disclose the sales, and thus loses his discharge because of false oaths and withholding information from the Trustee.  However, the Court finds that there is insufficient evidence that the Cantus failed to keep and preserve adequate records of the sales and that such failure prevented the Plaintiffs from ascertaining the Cantus' financial condition.  The evidence is similarly unclear regarding the Cantus' art consignments and their gifts of art.

Finally, the Plaintiffs allege that Mr. Cantu failed to keep or preserve adequate records of the Shah settlement.  The Court finds that Mr. Cantu kept adequate records of the settlement, but he failed to provide those records voluntarily to the Court and to the Trustee.  He improperly concealed the settlement, but he did not fail to keep adequate records.

---

[192] Trial Tr. 209-10 (day 1).

The Court denies Mark Cantu's discharge for his failure to keep records of the Dominion transfers, his use of cash from La Vista, and the contingency fee and water damage cases, but not for failure to keep records of the finances at the University Inn the jewelry sales, art consignments, or the Shah settlement.

### E.  Withholding Information from the Trustee

Finally, the Plaintiffs allege that the Cantus should be denied discharge because they knowingly and fraudulently withheld records from the Trustee.  Under § 727(a)(4)(D), discharge should be denied when the debtor "knowingly and fraudulently, in or in connection with the case . . . withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."  "All books and records which are material to an understanding of a debtor's financial condition and transactions are within the scope of § 727(a)(4)(D)."  *In re Robson*, 154 B.R. 536, 540 (Bankr. E.D. Ark. 1993) (citing *Wortman v. Ridley (In re Ridley)*, 115 B.R. 737 (Bankr. D. Mass. 1990)).

The Cantus were required to cooperate with the Trustee.  "A debtor is under an affirmative duty to assist the Trustee in assembling records.  The Trustee is not required to play detective and does not have the resources to do so."  *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 595 (Bankr. N.D. Tex. 1991).  The Plaintiffs questioned Mark Cantu regarding his role in providing the relevant documents to the Trustee.  Mr. Cantu was actively involved in the production of the Cantus' and the Mar-Rox records.[193]  Moreover, as an experienced attorney, Mr. Cantu was particularly capable of comprehending the importance of adequate production of records.  The Court therefore concludes that, to the extent the Cantus withheld records, Mr.

---

[193] Trial Tr. 95-96 (day 1).

Cantu is individually responsible.   The Plaintiffs proved that Mr. Cantu knowingly and fraudulently withheld material records of (i) the jewelry sales and art consignments; (ii) the contingency fee interests; (iii) the Dominion transfers; (iv) the finances of the University Inn and La Vista; and (v) the Cantus' bank statements and other financial records.

(i)      <b>Jewelry Sales and Art Consignments</b>

Mark Cantu withheld records of the jewelry sales and art consignments.  As discussed above, Mr. Cantu had some records of the jewelry sales.[194]   He knew how to obtain the information from the jewelry stores and the gallery.  However, he never provided the Trustee a list of the jewelry or artwork that he had sold, even after the Court compelled the Cantus to identify and list all jewelry, collectibles, and artwork they had sold.[195]

The Plaintiffs, including the Trustee, did not find out about the specifics of the Regency, Shannon, and Nuevo Santander sales until they had subpoenaed records from the jewelry stores and the gallery.[196]   The art and jewelry sales involved tens of thousands of dollars, and the records were material to an understanding of the Cantus' financial condition and transactions. Mr. Cantu fraudulently omitted the jewelry sales from his Statement, and then he intentionally withheld documents concerning the art and jewelry sales even after the records were compelled. The Court finds that Mark Cantu knowingly and fraudulently withheld documents about the art and jewelry sales from the Trustee.

---

[194] Trial Tr. 209-10 (day 1).

[195] Pls' Ex. 48; Trial Tr. 75 (day 2).

[196] Trial Tr. 134, 208-09 (day 1).

### (ii)    Contingency Fee Interests

Mark Cantu failed to provide records of his law office's contingency fee interests in the Abigail Moreno and Summit Sports Club cases.[197]   Failure to disclose contingency fee cases warrants denial of discharge under § 727(a)(4)(D).   *Lopez v. Vehicle Removal Corp. (In re Lopez)*, 111 F. App'x 725 (5th Cir. 2004) (affirming the bankruptcy court's denial of discharge under § 727(a)(4)(D) for "failing to list settlements and payments on contingency fee cases after he became aware that the money received was part of the bankruptcy estate").

Although Mr. Cantu gave the Trustee a stack of contingency fee contracts,[198] Mr. Cantu did not give the Trustee any information about these two cases.  Mark Gravely, the attorney for the Summit Sports Club case, contacted the Trustee.

Mr. Cantu asserted that Gravely contacted the Trustee after Mr. Cantu gave him the Trustee's contact information.[199]   As discussed above, even if this assertion is true, Mr. Cantu failed in his duty to provide information about the cases to the Trustee.  The Trustee was not required to piece together information about the Cantus' assets, and Mr. Cantu was obligated to provide additional information.

Mr. Cantu knew or should have known about the interests at the time the case was converted.  The Court finds that, in the context of Mr. Cantu's numerous omissions, his failure to provide information about the cases upon conversion was fraudulent.  The withholding of information about the contingency fee interests was knowing, fraudulent, and material.

---

[197] The Court has already found that Mark Cantu failed to keep adequate records of these cases.  This finding does not conflict with the conclusion that he failed to provide whatever records he did have to the Trustee.

[198] Trial Tr. 52 (day 2).

[199] Trial Tr. 146-47 (day 1).

### (iii)   Dominion Transfers

Mark Cantu used the checking account of the Dominion Apartments to pay numerous personal expenses while he was in bankruptcy.[200]  The transactions between Dominion and the Cantu law office were complex, numerous, and material to the Cantus' bankruptcy.  Mr. Cantu failed to provide any records of these transactions to the Trustee.[201]  The Trustee received only a rent roll from Dominion.[202]

Mr. Cantu knew that Dominion money had been used to pay thousands of dollars in living expenses, including Mercedes payments of $4,111.60 each,[203] the Cantus' home mortgage,[204] and their children's school tuition.[205]  More detailed records of the payments were available.[206]  Mr. Cantu knowingly failed to provide these records.

Moreover, after being ordered to provide records of all the Cantus' "cash payments, checks, payments made for your benefit including living expenses such as utility bills, grocery bills, credit card payments, mortgage payments, doctors' fees, insurance premiums and car payments," Mr. Cantu produced only a two-page list of checks.[207]  This request for production required far more than an account of personal expenses paid from the Dominion account; it required complete records of the Cantus' living expenses.  However, Mr. Cantu provided *less*.

---

[200] Trial Tr. 98-102 (day 1).

[201] Trial Tr. 51 (day 2).

[202] Trial Tr. 51 (day 2).

[203] Trial Tr. 104 (day 1).

[204] Trial Tr. 99 (day 1).

[205] Trial Tr. 100-01 (day 1).

[206] *See* Pls' Ex. 39 (check register for Dominion).

[207] Trial Tr. 96 (day 1).

He did not produce the Dominion check register, which was admitted as Plaintiffs' Exhibit 39 and would have been available to Mr. Cantu.  In response to a direct request, Mr. Cantu failed to turn over the Dominion check register.  The Court finds that Mr. Cantu knowingly and fraudulently withheld the Dominion records.

### (iv)    University Inn and La Vista

As discussed above, the Court finds that the Cantus failed to keep and preserve financial records, including records of cash withdrawals, at the University Inn and La Vista.  In addition to their failure to keep and preserve adequate records, the Court finds that they failed to provide the records they had to the Trustee.

Although the Cantus did not keep and preserve adequate records of cash withdrawals, they did have some records at the University Inn.[208]  Mr. Cantu testified that he got receipts for his cash withdrawals from La Vista.[209]  Ms. Cantu testified that she believed the hotel used Quicken as its accounting software.[210]

Even after Lone Star foreclosed on the University Inn, the University Inn records remained relevant and material to the bankruptcy.  However, the Cantus never provided any documents from the University Inn to the Trustee.[211]  From La Vista, the Trustee received only a rent roll list.[212]  Records from the University Inn and La Vista were material to their bankruptcy.  The Cantus were affirmatively obligated to provide any records they had to the Trustee.  The evidence shows that they had some documents, but they provided virtually nothing to the

---

[208] *See* Trial Tr. 19, 32, 204 (day 1), Trial Tr. 126 (day 2).

[209] Trial Tr. 120 (day 1).

[210] Trial Tr. 126 (day 2).

[211] Trial Tr. 51 (day 2).

[212] Trial Tr. 51 (day 2).

Trustee.  Mr. Cantu was aware that records from the University Inn and La Vista were material to the Cantus' financial condition, and he intentionally withheld them.  The Court finds that he knowingly and fraudulently withheld the records.

### (v)    Bank Statements and Other Financial Records

As discussed above, the Cantus failed to produce adequate records of their living expenses.  In response to a compelled request for production of all records pertaining to living expenses, Mr. Cantu produced only a two-page list of checks.[213]  He did not produce other bank records or financial records that would have enabled the Trustee to ascertain what had actually been spent on living expenses.

Furthermore, Mr. Cantu failed to produce bank statements for all of the bank accounts he listed on his schedules.[214]  The bank accounts and more detailed records of the Cantus' living expenses were material to the Cantu's bankruptcy. The Court finds that Mark Cantu knew the order required a more substantial production, and he also knew that he was required to provide bank statements for all his scheduled accounts.  He fraudulently and intentionally withheld these records. Mr. Cantu therefore is denied a discharge under § 727(a)(7), for withholding Mar-Rox records, and under § 727(a)(4)(D), for withholding the Cantus' records.

### Roxanne Cantu's Discharge

Roxanne Cantu was not involved in many of the actions that warrant denial of Mark Cantu's discharge.  For example, Ms. Cantu testified credibly that she did not know anything about the improper transfer to Baldemar Perez.  There is no evidence that she was aware of the unscheduled contingency fee cases or the Mar-Rox water damage cases.  She did not participate

---

[213] Trial Tr. 96 (day 1).

[214] Trial Tr. 35-37 (day 2).

in Mr. Cantu's willful violations of court orders in connection with the Cor-Can adversary and the sale of the Atrium.

However, Ms. Cantu:  (i) participated in the improper use of University Inn funds in violation of the cash collateral order; (ii) made false oaths in both the Cantu's individual case and in the Mar-Rox case; (iii) participated in the concealment of the bronze horses; and (iv) failed to keep adequate records at the University Inn.   The Court therefore denies Roxanne Cantu's discharge.

### A.  Refusal to Comply with Lawful Court Orders

The Plaintiffs proved that Roxanne Cantu refused to comply with the provisions of the Lone Star cash collateral orders.[215]  Violation of the lawful cash collateral order warrants loss of discharge if Ms. Cantu's noncompliance was willful and intentional.

Ms. Cantu had at least constructive knowledge of the Lone Star cash collateral orders. The docket reflects that the orders were sent to Ms. Cantu's counsel.  She is charged with her lawyer's knowledge.  In *Walter*, the court found that a debtor had constructive knowledge of a turnover order when she received the order at her address and nothing prevented her from seeing it.  265 B.R. at 760.  The basis for Ms. Cantu's constructive knowledge is even stronger.  Ms. Cantu helped run the University Inn.[216]  She was responsible for ensuring that the cash collateral orders, as they pertained to the rents collected at the University Inn, were complied with.  She is an educated woman, capable of reading and understanding the orders.[217]  The Cantus presented no evidence that Ms. Cantu was prevented from seeing the orders.  The Court finds that Ms.

---

[215] No. 08-70261, Doc. No. 50; No. 08-70260, Doc. No. 229.

[216] Trial Tr. 99 (day 2).

[217] *See* Trial Tr. 98 (day 2).

Cantu knew, or should have known, that the failure to deposit all University Inn rents in the DIP accounts violated the cash collateral orders.

However, Ms. Cantu continued to remove cash from the drawer at the University Inn, directly violating the orders' clear provisions that all rents were to be segregated and deposited in the DIP account.[218]   Moreover, because the second order's authorization to use cash collateral expired on September 17, 2008, Ms. Cantu was not authorized to use the rents, profits, or proceeds from the hotel for any purpose.

Ms. Cantu testified that she used the cash to make improvements to the hotel.[219]   The Court finds this explanation plausible, and the Court does not find that she improperly transferred or concealed estate funds under § 727(a)(2)(B).  But even the legitimate use of estate funds was prohibited by the cash collateral orders, and Ms. Cantu was aware or should have been aware of the prohibition.  She nonetheless persisted in using Lone Star's cash collateral, and there is no evidence that the rents were ever segregated.  Finally, Ms. Cantu also failed to deposit the $200.00-$300.00 in rental home income in the DIP accounts each month.[220]  As the manager of the Cantus' businesses, Ms. Cantu is at least equally responsible for the violation of the orders.

The Court finds that Ms. Cantu's continued use of Lone Star's cash collateral and failure to deposit income from the rental homes were willful and intentional violations of the Court's lawful cash collateral order.  Roxanne Cantu therefore is denied a discharge under § 727(a)(7) and § 727(a)(6)(A).

---

[218] Trial Tr. 110, 112 (day 2).

[219] Trial Tr. 112 (day 2).

[220] Trial Tr. 23 (day 1).

**B.  False Oaths**

Roxanne Cantu is also denied a discharge because she made false oaths.  Although there was insufficient evidence of Ms. Cantu's knowledge and fraudulent intent with respect to many of Mr. Cantu's false oaths, the Court finds that Ms. Cantu made false oaths about:  (i) the Cantus' use of the cash from the estates; and (ii) the pre-petition jewelry sales.

<b>(i)        Monthly Operating Reports</b>

Ms. Cantu made false oaths on the Monthly Operating Reports about the use of the cash. This issue was tried by consent.  The Plaintiffs introduced the MORs signed by Roxanne Cantu into evidence, and the Cantus did not object.[221]  Moreover, they did not object to the Plaintiffs' questions to Ms. Cantu regarding whether she had signed the MORs.[222]  Plaintiffs' questions were clearly and specifically related to the issue of whether Ms. Cantu had knowingly made a false statement on the MORs that all funds were being deposited in the DIP accounts:

> **[Mr. Lumber]**        Here's another [MOR]—here's one—here's another one for June.  It's signed by you, true?
>
> **[Roxanne Cantu]**        True.
>
> **[Mr. Lumber]**        It asks if all money is being deposited into DIP bank accounts and it's marked "yes," true?
>
> **[Roxanne Cantu]**        True.
>
> **[Mr. Lumber]**        Do you know whether all money was really being deposited into all the DIP bank accounts?
>
> **[Roxanne Cantu]**        I don't know.[223]

---

[221] Trial Tr. 6-7 (day 1).  *See* Trial Tr. 101 (day 2) (identifying Pls' Ex. 1 as an MOR); Trial Tr. 103 (day 2) (identifying Pls' Ex. 12 as an MOR); Trial Tr. 107 (day 2) (identifying Pls' Exs. 26 & 27 as MORs).

[222] *E.g.*, Trial Tr. 106-07, 114-18 (day 2).

[223] Trial Tr. 115 (day 2); *see also* Trial Tr. 116-18 (day 2) (showing similar questions regarding other MORs).

At no point did the Cantus object to the relevance of the Plaintiffs' questions regarding the MORs and Ms. Cantu's knowledge of the statements on the MORs. The Cantus had a fair opportunity to defend against the evidence that Ms. Cantu made false oaths on the MORs.

Ms. Cantu signed the May and June MORs for both the Cantus' individual bankruptcy case and for the Mar-Rox case.[224] A question on the MORs asks if all money is being deposited in the DIP bank accounts, and it was marked "yes." She testified at trial that she did not know if that answer was true or not. Testimony indicated, however, that she knew money was being removed from the bankruptcy estates, both by herself and by Mark Cantu.

The removed funds were not reflected on the MORs. Accountant George Stone prepared the Cantus' MORs.[225] Stone testified that any cash that was not deposited into the DIP bank accounts was not reflected on the MORs.[226] Stone noted, "I did my work based upon the bank statements and copies of checks. . . . And for the record, I was never informed about cash being taken."[227] Although the Court accepts Ms. Cantu's explanation that she was using the cash for a legitimate purpose, she was not authorized under the cash collateral orders to use the money at all.

This absence of authorization compounds the seriousness of Ms. Cantu's failure to make the required disclosures of the use of the cash and her falsely stating (on the MORs) that all of the revenues were being deposited into the DIP bank accounts.

---

[224] No. 08-70261, Doc. Nos. 115, 117 & 119; No. 08-70260, Doc. Nos. 186, 187 & 196. *See* Trial Tr. 115-16 (day 2).

[225] Trial Tr. 48-49 (day 1).

[226] Trial Tr. 49-50 (day 1).

[227] Trial Tr. 50 (day 1).

Ms. Cantu knowingly misstated on the MORs that all the money was being deposited in the DIP bank accounts in the Mar-Rox case and in the Cantus' individual case. Ms. Cantu's testimony makes it clear that she knew that all the money was *not* being deposited in the DIP bank accounts. At trial, Ms. Cantu admitted that not all the funds were being deposited into DIP bank accounts:

> **[Mr. Lumber]**        So, now, based on your prior questions, your prior testimony, do you know whether that money was being deposited in the DIP accounts?
>
> **[Roxanne Cantu]**     I don't believe that it was.
>
> **[Mr. Lumber]**        Okay.   So, when we talked about those questions that were on the monthly operating reports, Ms. Cantu, and in particular we talked about this question, "Are all funds received being deposited into DIP bank accounts?" That wasn't entirely true, was it?   Because there was money being taken that was not being deposited into DIP bank accounts?
>
> **[Roxanne Cantu]**     That's correct.[228]

She later indicated that she did not know whether the money was being deposited into the DIP bank accounts, stating, "The answer is that at most times I'm sure that it was being deposited, but there could have been a time when [Mark] got some money and then, in that case, it wasn't."[229]

Ms. Cantu knew that she personally was using cash from the University Inn's petty cash drawer to improve the property, rather than depositing all rents in the Mar-Rox DIP accounts.[230]

Ms. Cantu also knew that Mr. Cantu regularly removed cash from both the Mar-Rox estate and the Cantus' individual estate and that, in the course of any given month, there was a

---

[228] Trial Tr. 114 (day 2).

[229] Trial Tr. 116 (day 2).

[230] Trial Tr. 110, 112 (day 2).

high probability that he had removed cash.[231]  She was aware that Mr. Cantu was taking money from La Vista.[232]  La Vista was part of the Cantus' individual bankruptcy, and its cash receipts were reported on the Cantus' MOR.[233]  Ms. Cantu used approximately $1,800.00-$2,000.00 a month in cash—which she obtained from Mr. Cantu—for personal expenses.  Ms. Cantu did not know where the cash came from, but she continued to take the money and use it.[234]

The Court concludes that Ms. Cantu signed the MORs fraudulently and with knowledge that the statements regarding the Cantu and Mar-Rox DIP bank accounts were false.

The false statements about whether the money was being deposited into the DIP bank accounts were material.  The information on the MORs directly concerns the management of the bankruptcy estate, and the depositing of cash into the DIP accounts was an important requirement of the cash collateral order.  The misstatements went far beyond the requirements for materiality under *Beaubouef*.

Roxanne Cantu made these misstatements on the MORs in both the Mar-Rox bankruptcy and in the Cantus' individual bankruptcy.  Therefore, Roxanne Cantu is denied a discharge under § 727(a)(4)(A) and § 727(a)(7).

### (ii)    Jewelry Sales

Mr. Cantu also made false oaths about the Cantus' sale of $134,575.00 in jewelry in the two years prior to the bankruptcy.  Mr. Cantu testified that Ms. Cantu kept some records concerning the jewelry sales:

---

[231] *E.g.*, Trial Tr. 111 (day 2).

[232] Trial Tr. 113-14 (day 2).

[233] *See, e.g.*, No. 70260, Doc. No. 187, at 9.

[234] Trial Tr. 127-28 (day 2).

> **[Mr. Kasofsky]**      In regards to your jewelry sales consignments, what kind of records did you keep on that?
>
> **[Mark Cantu]**      Regency Jewelers and [Shannon] were the ones that got those—the records, that had the records.  I believe that they subpoenaed them.  And my wife provided some records, and I provided them to the trustee.[235]

Additionally, the receipts from Shannon Fine Jewelers list Roxanne Cantu's name, showing that Ms. Cantu was directly involved in those jewelry sales.[236]  Ms. Cantu knew, at the very least, about the $26,250.00 in sales to Shannon Fine Jewelers.  Although Mr. Cantu was more responsible than Ms. Cantu for preparing the Statement of Financial Affairs, Ms. Cantu also signed it under oath.  In light of Ms. Cantu's education and business experience, the Court concludes that she was aware that she had a duty to read through the Statement of Financial Affairs before signing it.  Considering Ms. Cantu's knowledge of other omissions and misstatements during the course of the bankruptcy, the Court finds that Ms. Cantu signed the Statement with at least reckless disregard for the truth.  The material omission of the jewelry sales warrants denial of Roxanne Cantu's discharge.

### (iii)      Other Alleged False Oaths

The Court finds that there is insufficient evidence that Roxanne Cantu was aware of the other alleged false statements.  There was no evidence that Ms. Cantu was aware of the unscheduled contingency fee cases, and the Court finds it entirely plausible that Ms. Cantu would not have had direct knowledge of the assets of Mark Cantu's law office.  Mr. Cantu was responsible for running the law office, and Ms. Cantu helped her sister Sandy run the

---

[235] Trial Tr. 209-10 (day 1).

[236] Pls' Ex. 77.

properties.[237]   Furthermore, there was no evidence that Ms. Cantu was aware that the furniture at the law office was, as Mr. Cantu testified, held for others.   The Court therefore finds that Ms. Cantu was not involved in the false oaths concerning the contingency fee cases and the office furniture.

The evidence was less clear concerning Ms. Cantu's knowledge of the Mar-Rox water damage cases.  Ms. Cantu was involved in running most of the Mar-Rox properties, and she, like Mr. Cantu, had a responsibility to ensure that the schedules were accurate.   Ms. Cantu is educated and capable of being informed of the water damage cases.

However, the Court concludes that the Plaintiffs did not prove Ms. Cantu's fraudulent intent in omitting the water damage cases.   First, although there was ample evidence that Mr. Cantu knew about the cases, there was no evidence that Ms. Cantu knew about them. Plaintiffs did not ask Ms. Cantu about the water damage cases.   Second, Ms. Cantu's involvement in managing the Mar-Rox properties is not enough to create an inference that she knew about the water damage cases.  Mr. Cantu hired the attorneys for the water damage cases. Although Ms. Cantu helped to manage the Mar-Rox properties, it is plausible that she was not, unlike Mr. Cantu, actively involved in managing Mar-Rox's legal affairs.

The Court will not infer Ms. Cantu's knowledge or fraudulent intent regarding the Mar-Rox water damage cases.   Ms. Cantu's pattern of omissions and misstatements, although significant, would not sufficiently support inferences of both knowledge and fraudulent intent in the absence of any evidence.   The Court therefore finds that, with respect to Ms. Cantu, the Plaintiffs did not prove false oaths regarding the unscheduled contingency fee cases, the office furniture, and the Mar-Rox water damage cases.

---

[237] Trial Tr. 207 (day 1); Trial Tr. 99 (day 2).

### C.  Improper Concealment

Like her husband, Ms. Cantu is personally responsible for the concealment of the bronze horses.  Ms. Cantu had the same duty as Mr. Cantu to disclose the existence of the bronze horses on the schedules.  The horses were stored at the University Inn, which Ms. Cantu helped run.[238]  Mr. Cantu purchased the horses, but Ms. Cantu was aware that the horses were stored in bubble wrap in a storage unit at the hotel.[239]  She had an affirmative duty to ensure the accuracy of the schedules.  Like Mr. Cantu, however, she signed schedules, including an amended Schedule B in January 2009, that did not list the horses.

Ms. Cantu testified that she "had forgotten" about the horses.[240]  Even if she forgot about the horses until the time they were moved, she would have been aware of the existence of the horses in January 2009.  Ms. Cantu admitted at trial that before moving the horses from the University Inn, she and Mr. Cantu had to ask the bank for permission to go to the hotel and collect their personal property.[241]  She then participated in moving two "big," life-sized horses to Roach's house:  "We took them to my sister-in-law's."[242]  She did not inform the bank that she and Mr. Cantu were going to remove two bronze statues.[243]

It is not plausible that Ms. Cantu continued, during and after January 2009, to be unaware of the existence of the bronze horses.  However, she failed to amend the schedules to correct the omission.  Ms. Cantu furthered the concealment by participating in secreting the horses to

---

[238] Trial Tr. 99 (day 2).

[239] Trial Tr. 119-20 (day 2).

[240] Trial Tr. 121 (day 2).

[241] Trial Tr. 120 (day 2).

[242] Trial Tr. 122 (day 2).

[243] Trial Tr. 125 (day 2).

Celeste Roach's property.  At trial, Ms. Cantu testified that she did not know whether Mr. Cantu had gifted the horses to his sister or not.[244]  However, she knew that the horses had been moved to Roach's property, and she knew or should have known that the horses were not listed on the Cantus' schedules.

As discussed above, the concealment of the horses on the property of a close relative creates a presumption of fraudulent intent.  *See Duncan*, 562 F.3d at 698.  Neither Mr. Cantu nor Ms. Cantu rebutted this presumption.  Furthermore, when Ms. Cantu's failure to correct the schedules is considered in light of her overall failure to comply with court orders, misstatements on the MORs, and her participation in moving the horses, the Court finds that she acted with fraudulent intent and/or reckless indifference to the truth.  *See Guenther*, 333 B.R. at 767-68 (finding that a pattern of non-responsiveness, delay in amending schedules and statements, and withholding information was sufficient to show fraudulent intent and/or reckless disregard for the truth for the purposes of a § 727(a)(4)(A) action).  Ms. Cantu intentionally and fraudulently concealed estate property after the filing of the bankruptcy petition, and the Court denies her discharge under § 727(a)(2)(B).

### D.  Failure to Keep Records

As discussed above, the Cantus failed to keep and preserve adequate records of their cash withdrawals from the University Inn and La Vista, and this failure kept the Plaintiffs from ascertaining the Cantus' financial condition.  The failure to kept and preserve adequate records was not justified.  The Court does not accept the Cantus' explanation that the University Inn records were taken over by Lone Star when the hotel was foreclosed.  Because the Cantus' use of

---

[244] Trial Tr. 122, 127 (day 2).

cash from the University Inn remained relevant to the bankruptcy case even after foreclosure, they had a duty to ensure that they retained information regarding the cash withdrawals.

Ms. Cantu was responsible for the majority of the withdrawals from the hotel. She was also more actively involved in the management of the hotel than Mr. Cantu, and thus more responsible for keeping and preserving records of the cash withdrawals. Her failure to maintain these records justifies the denial of her discharge.

Ms. Cantu justifiably relied on Mr. Cantu to keep the records of the Dominion transfers. Other than testimony that Ms. Cantu used the Dominion credit card for personal expenses,[245] the evidence did not show that Ms. Cantu was involved in these transfers. The transfers involved the payroll of Mr. Cantu's law office and his Mercedes payments. Mr. Cantu was responsible for running his own law office, and he would presumably, and reasonably, have been responsible for keeping the law office's records. Ms. Cantu could also reasonably have relied on Mr. Cantu to keep records of the Dominion transfers.

Finally, Ms. Cantu was justified in relying on Mr. Cantu to keep records of the Mar-Rox water damage cases and the contingency fee interests. Mr. Cantu appears to have been responsible for managing the prosecution of the water damage cases, and Ms. Cantu could reasonably have relied on him to keep records of Mar-Rox's legal affairs. Mr. Cantu also ran his own law office, and Ms. Cantu appears to have had little involvement in the law office's business. The Cantus divided the management of their businesses. Because of the division, Ms. Cantu's reliance on Mr. Cantu's record-keeping for his businesses and for Mar-Rox's legal affairs was justified.

---

[245] Trial Tr. 128 (day 2).

71 / 72

The Court therefore does not deny Ms. Cantu's discharge for failure to keep records of the Dominion transfers, the Mar-Rox water damage cases, and the contingency fee interests. The Court denies Ms. Cantu's discharge for failure to keep and preserve adequate records of the cash withdrawals from the University Inn.

### E.  Other Alleged Bases for Denial of Roxanne Cantu's Discharge

The Court finds that there is insufficient evidence that Ms. Cantu knowingly and fraudulently withheld records from the Trustee. Although the evidence was clear that Mark Cantu knowingly withheld records, the Plaintiffs did not prove that Roxanne Cantu was involved in withholding records, much less that she had fraudulent intent. The Court therefore does not deny Roxanne Cantu's discharge under § 727(a)(4)(D).

### CONCLUSION

The Court denies discharge to both Mark Cantu and Roxanne Cantu. A separate judgment will be issued.

The Court's Case Manager is directed to deliver a copy of this Memorandum Opinion to the State Bar of Texas and to Chief Judge Hinojosa.

SIGNED **February 17, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE